**THOMPSON et al. v. H. ROUW CO.**

No. 12176.

Court of Civil Appeals of Texas. San Antonio.

Jan. 10, 1951.

Rehearing Denied Feb. 7, 1951.

Eskridge & Groce and Bond Davis, all of San Antonio, Kelley, Mosheim & Ryan, Houston, for appellant.

Hardin & Little, Edinburg, for appellee.

POPE, Justice.

This suit concerns the constitutionality of Article 2226, Vernon's Ann.Civ.Stats., awarding an attorney's fee upon recovery

of judgment for freight damages in an interstate shipment, and also whether a commission computed on the basis of the market value of the shipment in good condition should be deducted from the consignor's damages.

The material facts of this case are conceded by both the shipper and carrier. Appellee shipper delivered to appellant carrier at Carrizo Springs, Texas, a carload of carrots consigned to St. Louis, Missouri, under a Uniform Bill of Lading. The carrier in turn delivered the carrots to connecting carriers and after the shipper ordered several diversions the shipment ultimately arrived in Philadelphia, Pennsylvania, in a deteriorated condition, where the carrots were sold for $388.50, which was the best price obtainable. But for two days' delay and defective equipment chargeable to the carrier, the carrots would have arrived in good order and would have been sold for $1,327.50, which was the wholesale market price for the carrots. The shipper had consigned the carrots to Justman-Frankenthal at Philadelphia, who would have charged the shipper a commission of seven per cent, or $92.93 for handling the sale at the Philadelphia market. Justman-Frankenthal actually received a commission of $27.20, that being the commission on the amount for which the carrots were sold in Philadelphia. No delay in shipment was chargeable to the carrier until after the carrots arrived in St. Louis, Missouri, but the point at which defective equipment was used is not shown and may have been in Texas or any other place along the line. The shipment was an interstate shipment.

The trial court gave the shipper judgment, together with interest, for the difference between the market value of the carrots had they arrived in good condition without delay ($1,327.50) and the market value of the carrots which arrived in bad condition after the delay ($388.50) less the commission not earned ($92.93), but did allow the commission actually earned ($27.20). The trial court added to these damages the sum of $250.00 as attorney's fees, which is conceded to be reasonable, if it is a proper allowance. Other adjustments not here under attack were made in the amount of the judgment. Appellant carrier raises the point that the trial court improperly allowed an attorney's fee, and appellee shipper, by counter-point, objects because the full commission of the consignee was not allowed. These are the only points here involved.

■ We sustain appellant's objection to the allowance of the attorney's fee. Article 2226, Vernon's Ann.Civ.Stats., as amended in 1949, authorized a recovery of a reasonable attorney's fee in addition to the recovery on the claim and costs, in the event of a judgment for freight damages in any amount, unless the claim was paid or satisfied within thirty days. Prior to the 1949 amendment Article 2226 permitted a recovery of an attorney's fee not to exceed twenty dollars on claims not exceeding two hundred dollars. That statute in 1914 was held not in violation of the commerce clause of the United States Constitution. Missouri, Kansas & Texas Railway Company v. Harris, 234 U.S. 411, 34 S. Ct. 790, 58 L.Ed. 1377. The Harris case expressly limited the effect of its holding to claims for damages occurring while the freight was in possession of a carrier within the State of Texas; and unlike the instant case, dealt with a statute which permitted a nominal and limited fee on small claims where the full amount sued for was recovered. Less than one year after the Harris case the Supreme Court of the United States, after distinguishing the Harris case, struck down a South Carolina statute which imposed a fifty dollar penalty for failure to pay an overcharge claim within forty days. Charleston & Western Carolina Ry. Co. v. Varnville Furniture Company, 237 U.S. 597, 35 S.Ct. 715, 59 L.Ed. 1137.

■ Since Article 1, § 8, of the United States Constitution empowers the Congress to regulate commerce among the several States, state laws must yield when the federal law occupies the field on the same subject of interstate commerce. Chicago, R. I. & G. R. Co. v. DeBord, 109 Tex. 20, 192 S.W. 767. There can be little doubt that Congress had undertaken to legislate con-

cerning the measure of damages to freight in an interstate shipment. This matter has long since been decided. The United States Supreme Court in discussing the scope of the Carmack Amendment enacted in 1906, 49 U.S.C.A. § 20(11, 12), held·in the case of Adams Express Co. v. Croninger, 226 U.S. 491, 33 S.Ct. 148, 152, 57 L.Ed. 314,·that local regulation may neither diminish·nor increase the carrier's liability, and said:

"It embraces the subject of the liability of the carrier under a bill of lading which he must issue, and limits his power to exempt himself by rule, regulation, or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede ·all state regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the state upon the subject of such contracts. But when Congress acted in such a way as to manifest a purpose to exercise its conceded authority, the regulating power of the state ceased to exist. (Citing authorities.)

"To hold that the liability therein declared may be increased or diminished by local regulation or local views of public policy will either make the provision less than supreme, or indicate that Congress has not shown a purpose to take possession of the subject. The first would be unthinkable, and the latter would be to revert to the uncertainties and diversities of rulings which led to the amendment."

The period between the Carmack Amendment in 1906 until 1920 was marked with great uncertainty as to the correct measure of carrier liability. The Croninger case in 1913, supra, upheld a provision in the bill of lading limiting a carrier's liability to the declared value. To correct

this measure of liability the Congress in 1915 enacted·the first Cummins amendment to· the Carmack amendment· and imposed liability upon the carrier for "the full actual loss, damage, or injury to such property caused by it * * *" without any limitation. Title 49, § 20(11), U.S.C.A.; 52 I.C.C. 678. Bills of lading and tariffs were then promulgated .providing that liability of the carrier should be computed on the basis of the value of the property at the place and time of shipment, together with freight charges if paid. In 1920 the United States Supreme Court declared that measure of damages improper and re-asserted the common law measure of damages as the correct meaning of the Cummins amendment. Chicago, Milwaukee & St. Paul Railway Co. v. McCaull-Dinsmore Co., 253 U.S. 97, 40 S.Ct. 504, 64 L.Ed. 801. The Interstate Commerce Commission carried forward this decision and in 1921 promulgated a bill of lading which provided: "The carrier or· party in possession of any of the property herein described shall be liable *as at common law* for any loss thereof or damage thereto, except as hereinafter provided."

■ The shipment here in question moved under this same form of bill of lading. The history of these enactments, decisions, and promulgations demonstrates that it is now settled that nothing more nor less may be recovered than allowed under the common law. Attorney's fees are not recoverable under the common law. We have been cited to no case permitting such recovery in cases of carrier liability for damages to interstate shipments, and we have found none.[1] Attorney's fees are not proper damages to a shipper against the carrier at common law. Shell Petroleum Corporation v. Howth, Tex.Civ.App., ·133 S.W.2d 253, affirmed Shell Oil Co. v. Howth, 138 Tex.

---

1. In the Matter of Bills of Lading, 52 I.C. C. 710 (1919) "The general rule of the common law is that the measure of damages for which the carrier is liable, in the absence of specific stipulations in relation thereto, is the market value of the goods at destination, plus interest on such· value from the date when, in general course, the goods should have been delivered, less the unpaid transportation

charges, if any. Mobile & Montgomery R. Co. v. Jurey, 111 U.S. 584, 4 S.Ct. 566, 28 L.Ed. 527; O'Hanlon v. Ry. Co., 6 Best & S. 484; Rodocanachi v. Milburn, 18 Q.B.Div. ·67. To the same general effect are cases decided by the various state courts. Compensation on this basis will generally make the owner whole in respect of his loss."

357, 159 S.W.2d 483; Houston Production Co. v. Taylor, Tex.Civ.App., 33 S.W.2d 202; 15 Am.Jur. Damages, § 142; 25 C. J.S., Damages, § 50; 1 Sedgwick, Damages, pp. 463, 464; McCormick, Damages, p. 234.

Moreover, the Interstate Commerce Act, Title 49, § 8, U.S.C.A., expressly authorized the recovery of attorney's fees from a carrier for damages arising from violation of the law. Congress, therefore, did not overlook the matter of attorney's fees. In expressly providing for such recovery in instances of violation of the law by the carrier, on the one hand, and in failing to make such a provision in instances of carrier liability for freight damage, on the other, the Congress effectively legislated that none should be recovered in the latter instance.

Congress has taken the subject of interstate freight damages in hand and, as Justice Holmes expressed it, "coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go." [237 U.S. 597, 35 S.Ct. 717.] Charleston & Western Carolina Ry. Co., supra. Texas can not extend the interstate carrier's liability for losses, and certainly not to losses on other roads in other states. Congress has nationally undertaken the regulation of commerce between the states, and shippers will not be accorded the privilege of shopping among the states for forums which allow additional recoveries.

We also shall sustain appellee's counter-point and hold that the trial court erred in subtracting the commission based on the full market value from the market value and in allowing only the commission on the sum actually received. The Interstate Commerce Act, Title 49, § 20(11) U.S.C.A., states that a carrier "shall be liable to the lawful holder of said receipt, or bill of lading *or to any party entitled to recover thereon,* whether such receipt or bill of lading has been issued or not, *for the full actual loss, damage, or injury to such property* caused by it". This full actual loss has repeatedly been held to mean the difference between the market value at destination had the shipment arrived in good condition and the market value of the shipment in the condition in which it did arrive. It is conceded that had the shipment arrived in good condition, it would have had a market value of $1,327.50, of which the consignee would have received $92.93 as a commission.

We think the essence of the statute above quoted is that it permits full recovery to the lawful holder of the bill of lading. This holds true even though he is not the owner of the property. Pennsylvania R. Co. v. Olivit Bros., 243 U.S. 574, 37 S.Ct. 468, 61 L.Ed. 908; Southern Kansas R. Co. of Texas v. Morris, 100 Tex. 611, 102 S.W. 396. And it will be presumed that the action was commenced and prosecuted with the knowledge and consent of the consignee, and for his benefit, unless he objects. Missouri Pac. Ry. Co. v. Smith, 84 Tex. 348, 19 S.W. 509; Davis v. Wylie & Jackson, Tex.Com.App., 256 S.W. 256; 8 Tex.Jur., Carriers, § 255. The consignee commission agent was entitled to recover, had he elected to file the suit, and it has been held that he may recover the full amount of damages even though he is required to account to the shipper. Edgerton v. Chicago R. I. & P. Ry. Co., 240 Ill. 311, 88 N.E. 808; Collins v. Denver & R. G. Ry. Co., 181 Mo.App. 213, 167 S.W. 1178; Terry v. Pennsylvania Railroad Co., 5 W.W. Harr., Del., 1, 156 A. 787; 13 C.J.S., Carriers, § 294(d). The matter of accounting between a shipper and consignee is of no concern to the carrier. 9 Am.Jur., Carriers, § 825.

The statute does not speak of damages to the consignor nor of damages to the consignee, but of damages to the property. The holder of the bill of lading may bring the suit for those damages, and the measure of damages is clear. We hold that the statute under construction is a rule of convenience. It enables a single suit against all carriers along the line for the full loss to the property. It manifests an intent to avoid multiplicity of actions and circuity of action.

Economists speak of a "normal price." It is a term which exists in theory only.

Ideally it would compute with accuracy the costs of production and marketing, together with a reasonable net profit, but the subtle and complex elements entering into "cost" are not subjects of general agreement even among the theorists.[2] Over the long period, costs will enter into the matter of price, for otherwise production will cease.

The market value rule is a general rule. It is a rule of convenience. It is instantly ascertainable at a given time and place from knowledge of buying and selling. It requires no estimate of costs, and is real rather than theoretical. Like market price in the business world, market value is handily used as an expeditious device. This explains its wide acceptance not only in carrier damages, but also in other fields of the law. But market price is sensitive to daily and even remote influences wholly unrelated to costs, and often prices are depressed far below costs, or even below the price of the freight bill. At other times market price greatly exceeds total cost.

▪▪▪ The carrier here urges that we should depart from the market value rule because the shipper's commodity stopped short of the market place, and we should catch the car at the point it stopped short of the market place and endeavor to ascertain the items of cost saved the shipper from that point forward to the wholesale market. This is a departure from the market value rule and is an effort to isolate costs and subtract them from the market value, whether costs actually on the day quoted on the market had any relation to market value or not. Subtraction of items of costs from market value is neither market value nor normal value. To modify a rule easy of application by one which opens the door to cost accounting applicable to individual shippers on isolated items, stretching all the way from the soil throughout the trade channels to the terminal market, should be indulged only upon a showing of superior reason, which we do not think exists. Gore Products v. Texas & N. O. R. Co., La.App., 34 So.2d 418.

Many factors affect costs. Many more affect price.[3] To adopt the rule here proposed would lead to inequities which we shall illustrate by three examples:

(1) A shipper of carrots may consign the car to himself and hire no commission

2. "Since cost frequently plays only a small part in the fixing of prices, it is necessary for us to turn to a consideration of certain other factors. These factors include competition, custom, quality, and reputation of the product * * *, and what the traffic will bear." The Principles of Marketing, Holtzclaw (1935), p. 600.

"Normal price is something like a moving target floating on a choppy sea, bobbing up and down, and perhaps moving steadily in a particular direction in obedience to some major current such as the Gulf Stream. The various ships shooting at the target do not always hit the bull's-eye; but the 'hits' are scattered around it. These hits are related to the bull's eye somewhat as actual prices are to the price objective which corresponds to the expense of production." Ely, Outlines of Economics (Fifth Rev.Ed.) p. 189.

3. "An enumeration of some of the influences that cause changes in prices may be of interest, however. Such influences include variations in harvests which not only contract or expand the supply * * *, but also decrease or increase to a greater or less degree, the purchasing power of such communities as are dependent in whole or in part upon such commodity; changes in demand due to changes in fashions, seasons, etc.; legislation changing internal-revenue taxes, import duties or bounties, inspection as to purity or adulteration; use of other articles as substitutes * * * improvements in methods of production * * *; cheapening of transportation or handling; speculative manipulation of the supply or of the raw product; commercial panic or depression; expanding or contracting credit; over-production; unusual demand owing to disputes between labor and capital in industries of limited producing capacity, * * * organization or combinations of mills or producers * * * economies in production * * *." U. S. Bureau of Labor Statistics, Bulletin No. 114, p. 22.

"The following causes have also been enumerated in the order of their importance in affecting commodity prices: '(1) Increase of gold supply, (2) exhaustion of natural resources, (3) rising standard of living, (4) withdrawal of population from agriculture, and growth of cities,

agent. He acts for himself. Such a shipper performs all the functions of the middleman to get his product on the wholesale market and sold, but there is no commission. It has never been suggested that from the market price in such circumstances, the usual commission should first be ascertained and then deducted from the market price.

(2) A shipper of carrots makes an outright sale to the consignee, and the consignee himself personally handles the car at the terminal market. He pays no commission, but it has not been suggested that the value of the consignee's services at the terminal market should be deducted from the market price, in instances where the carrier permitted deterioration of the carrots, thereby saving him extra work.

(3) A shipper of carrots consigns the car to a commission merchant who does charge a commission, but by reason of such facts as in the instant case, does not make a sale for the market price it should have brought. Are we to say that only in the latter case a different rule should apply? It is true that the sale was not made, but the law steps in and supplies the sale in instance three, just as it does in the other two instances. The law contemplates the sale for this very car, at the market place and at the market price.

In none of these three instances does the law contemplate the market value of a sealed anonymous car which arrived from an anonymous shipper for sale to an anonymous buyer. In each there is contemplated an introduction to a buyer, for up to that point there is no market, and

the car has no value. Carrots do not transact their own business. The very measure of damages contemplates either a commission agent, or someone else who will perform these necessary functions which are necessary to the existence of a market. Carrots have no value on a railroad siding with their arrival unannounced. This car of carrots actually arrived at the market place, but could not be sold for the price it should have brought. There is no occasion here to compute the costs of making the car available for sale. It was on the market but sold at the reduced price.

██ We recognize the necessity, at times, of measuring damages by estimating costs when no market exists, such as the translation of retail market values into wholesale market values, by endeavoring to compute and subtract costs. Illinois Central R. Co. v. Crail, 281 U.S. 57, 50 S. Ct. 180, 74 L.Ed. 669, 67 A.L.R. 1023; Quanah, A. & P. Ry. Co. v. Novit, Tex. Civ.App., 199 S.W. 496. We have no such problem here, for the wholesale market value for the exact product in question on the specific date concerned, with the product there at the market place is not questioned.

We construe the contention made here as being contrary to the meaning of the Interstate Commerce Act and as an unnecessary variance from a rule of damages that has won its way from antiquity and exists today because of its convenience in daily application.

The judgment will be reformed so that no attorney's fee will be allowed and so that no allowance is made for or deduc-

(5) trusts and combinations, (6) tariffs, (7) labor unions, (8) growth of population and unscientific methods of farming, (9) extravagance in expenditure, (10) waste and fraud in distribution, (11) uneconomical marketing and housekeeping, (12) speculation, (13) immigration.' " Babson, the Annals of The American Academy of Political and Social Science (Sept. 1911), p. 174.

"It is practically impossible to ferret out all of the influences that are at work upon the wholesale market prices. There is no single price; for the prices are composites; they are the result of com-

plex action. To escape a bewildering maze, it is necessary to keep in mind the fact that the price of today is really an inheritance of past years, that prices tend to persist unless there is tangible reason for change, that the true difficulty is to transmute an item of news into terms of price. Some change in the field of production or in the field of consumption will spread by direct or by indirect influence through the entire system, becoming less and less as it spreads, for the wholesale market price is a system with no logical beginning or end." Duncan, Marketing (1920), p. 231.

tion of commission. Judgment shall be for the sum of $1,018.19, together with interest as provided in the judgment of the trial court.

Reformed and Affirmed.