**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————

**No. 12-2269**

—————

GAINES MOTOR LINES, INC.; B.A.H. EXPRESS, INC.;
FREIGHTMASTER, INC.; DAVID PHILLIPS TRUCKING CO.; H.G.
SMITH COMPANY, INC.; TRIANGLE TRANSPORT AND DISTRIBUTION
SERVICES, LLC; GRAHAM TRUCKING ENTERPRISES, INC.; BIG BEN
TRUCKING, LLC,

        Plaintiffs - Appellants,

    and

SOUTHLAND TRANSPORTATION COMPANY,

        Plaintiff,

    v.

KLAUSSNER FURNITURE INDUSTRIES, INC.,

        Defendant – Appellee,

    and

SALEM LOGISTICS TRAFFIC SERVICES, LLC; SALEM LOGISTICS,
INC.,

        Defendants.

—————

Appeal from the United States District Court for the Middle
District of North Carolina, at Greensboro.  James A. Beaty, Jr.,
District Judge.  (1:09-cv-00302-JAB-JEP)

—————

Argued: September 18, 2013        Decided: October 30, 2013

—————

Before SHEDD, DUNCAN, and KEENAN, Circuit Judges.

———————

Vacated and remanded with instructions by published opinion. Judge Duncan wrote the opinion, in which Judge Shedd and Judge Keenan joined.

———————

**ARGUED:** Robert D. Moseley, Jr., SMITH MOORE LEATHERWOOD LLP, Greenville, South Carolina, for Appellants.  James Aaron Dean, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Winston-Salem, North Carolina, for Appellee.  **ON BRIEF:** C. Fredric Marcinak III, SMITH MOORE LEATHERWOOD LLP, Greenville, South Carolina, Jon Berkelhammer, SMITH MOORE LEATHERWOOD LLP, Greensboro, North Carolina, for Appellants.  Michael Montecalvo, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Winston-Salem, North Carolina, for Appellee.

———————

DUNCAN, Circuit Judge:

In this appeal, we address a question of first impression in this circuit: whether, absent a federal tariff, federal courts have subject matter jurisdiction over a motor carrier's breach of contract claim against a shipper for unpaid freight charges. For the reasons that follow, we find that the district court lacked jurisdiction to adjudicate this dispute, and we lack jurisdiction over this appeal. Accordingly, we vacate the district court's opinion and remand with instructions to dismiss.

I.

A.

Appellants are federally licensed motor carriers ("Motor Carriers") who transport goods in interstate commerce. Appellee, Klaussner Furniture Industries, Inc. ("Klaussner"), is a furniture company headquartered in Asheboro, North Carolina. The parties, with the exception of Appellant Graham Trucking Enterprises, Inc., are incorporated under North Carolina law.

Prior to the summer of 2007, Klaussner contracted directly with the Motor Carriers to deliver its furniture to corporate customers, including furniture retailers and renters, both in and outside of North Carolina. The Motor Carriers would submit

3

quoted rates directly to Klaussner who would then pick amongst the bids for each shipment.

Then, in August 2007, Klaussner contracted with a third-party broker, Salem Logistics Traffic Services, LLC ("Salem"), to coordinate all shipping logistics. Salem charged Klaussner a uniform rate that was generally higher than the Motor Carriers' individual bids. In return, Salem promised to reduce costs and improve customer service by coordinating stops to multiple Klaussner customers for each scheduled shipment. Salem was expected to deduct its commission, and then pay the motor carriers.

Doyle Vaughn, a Klaussner employee, personally notified the Motor Carriers that they would begin working directly with Salem. Shortly thereafter, Salem hired Vaughn, who continued to work from the same desk at Klaussner. Vaughn notified the Motor Carriers of his change in employment.

The Motor Carriers also received a series of documents, several of which bore both Klaussner's and Salem's logos, explaining Salem's new role. Salem's Vice President of Logistics, Ralph Raymond, sent a letter explaining that Salem would manage all "freight payment responsibilities." J.A. 454. The Motor Carriers were sent a Fuel Surcharge Addendum, a Mutual Non-Disclosure Agreement, and instructions from Salem on submitting quotes. Finally, Klaussner's Vice President of

4

Supply Chain, Chuck Miller, sent instructions to submit freight bills "designated as third party payment" to "Klaussner Furniture c/o Salem Logistics Inc." and then listed Salem's address. J.A. 461.

Each furniture delivery the Motor Carriers undertook required three documents: a Confirmation of Contract Carrier Verbal Rate Agreement ("Agreement"); a Carrier Pickup and Delivery Schedule ("Schedule"); and a bill of lading. The Agreement memorialized the rate agreed upon by Salem and the chosen motor carrier, and included the total freight charge for the load. A freight charge includes the agreed upon rate and standardized fees, such as a fuel charge. The Agreement was signed by the motor carrier and does not mention Klaussner. The Schedule listed the pick-up location as "Klaussner Furniture" and the destination address. Salem's address is listed under the "Bill-To & Contact Information" section.

The bills of lading executed by Klaussner and the Motor Carriers contained standardized provisions generally used in the trucking industry. Each bill of lading listed a motor carrier, a consignor, and a consignee. The party shipping the goods is the consignor. The party who recieves the goods is the consignee. Here, Klaussner was the consignor, and Klaussner's customer was the consignee. The bills of lading contained the statement: "freight charges are prepaid unless marked

5

otherwise," and three options: "Prepaid," "Collect," and "3rd Party."[1] Most of the relevant bills of lading were marked "Prepaid."

The bills of lading contained an executed non-recourse provision that stated:

> SUBJECT TO SECTION 7 OF CONDITIONS, IF THIS SHIPMENT IS TO BE DELIVERED TO THE CONSIGNEE WITHOUT RECOURSE ON THE CONSIGNOR, THE CONSIGNOR SHALL SIGN THE FOLLOWING STATEMENT:
> THE CARRIER SHALL NOT MAKE DELIVERY OF THIS SHIPMENT WITHOUT PAYMENT OF FREIGHT AND ALL OTHER LAWFUL CHARGES.
> Klaussner Furniture Industries, Inc.    BY: CAM SMITH[2]

J.A. 477-79. This non-recourse language was repeated, but not executed, in small print at the bottom of the bills of lading.

After initially making payments to the Motor Carriers, Salem defaulted on its obligations and ultimately went out of business. The Motor Carriers filed this action in the Middle District of North Carolina under 49 U.S.C. § 13706(b) of the Interstate Commerce Commission Termination Act against Klaussner

---

[1] The parties dispute the meaning of "Prepaid" but agree that, at minimum, it protects the consignee from liability for freight charges. "Collect" generally means the consignee is liable for the charges. "3rd Party" may be used to indicate that a third party, such as a broker, is responsible for the charges.

[2] A non-recourse provision generally protects the shipper from liability for freight charges once the goods are delivered to the consignee. See Illinois Steel Co. v. Baltimore & O. R. Co., 320 U.S. 508, 514 (1944).

and Salem[3] on April 22, 2009 to recover the $562,326.30 in freight charges Salem had failed to pay. In the alternative, the Motor Carriers sought to recover based on theories of unjust enrichment and equitable estoppel. After discovery, the Motor Carriers and Klaussner filed cross-motions for summary judgment.

B.

At the summary judgment hearing, the Motor Carriers first argued that, as a matter of law, when a bill of lading is designated "Prepaid," the shipper is always liable for the freight charges, even when there is also a non-recourse provision or a third-party broker is involved.[4] Klaussner countered that a "Prepaid" designation on a bill of lading means only that the consignee will not be liable for the freight charges. Klaussner argued that a non-recourse provision protects a shipper from liability for any charges above what it agreed to pay. In this case, Klaussner claimed it fulfilled its contractual obligations by paying Salem.

---

[3] By the summary judgment stage of the litigation, Salem had withdrawn. Salem is not a party to this appeal.

[4] The Motor Carriers also claimed the non-recourse provision was unenforceable because the non-recourse language in the footnote rendered it ambiguous. The district court found that because the language in the footnote was not executed, it was irrelevant to its analysis.

7

The district court granted Klaussner's motion for summary judgment on this issue, finding that the non-recourse provision protected Klaussner from double payment as a matter of law. The district court agreed with Klaussner that under Illinois Steel Co. v. Baltimore & O.R. Co., 320 U.S. 508 (1944), a non-recourse provision continues to protect shippers from any liability beyond its contractual obligations even when a bill of lading is also designated "Prepaid." The district court acknowledged that the designation of "Prepaid" instead of "3rd party" on the bills of lading introduced some doubt as to whether the Motor Carriers should have expected a third-party broker to pay shipping charges. However, the court found that, given Vaughn's verbal explanation of Salem's role and the multiple confirming documents, the Motor Carriers were on notice to expect payment from Salem.

The Motor Carriers also sought to establish Klaussner's liability under actual and apparent agency theories. The district court held, however, that the Motor Carriers' agency arguments failed to create a triable issue of fact. The district court found that the only fact on the record to support the Motor Carriers' actual agency argument was that Vaughn continued to work from the same desk at Klaussner after Salem hired him. Standing alone, this continuity failed to indicate Klaussner "retained the right to control [Salem]." Hylton v.

8

_Koontz_, 532 S.E.2d 252, 257 (N.C. 2000) (internal citations omitted). The district court held that the Motor Carriers' apparent agency argument failed because the documents with the dual logos, upon which the Motor Carriers' argument relied, were insufficient to suggest that Klaussner led the Motor Carriers to reasonably believe Salem was its agent. This appeal followed.

## II.

### A.

In a somewhat unusual twist, it was Klaussner, the prevailing party below, that argued for the first time on appeal that the district court lacked jurisdiction over this dispute. The timing, of course, does not affect our obligation to assure ourselves of our jurisdiction.

A challenge to a federal court's jurisdiction "'can never be forfeited or waived'" because it concerns our "very power to hear a case." _United States v. Beasley_, 495 F.3d 142, 147 (4th Cir. 2007) (quoting _United States v. Cotton_, 535 U.S. 625, 630 (2002)). In fact, we have "an independent obligation to assess [our] subject-matter jurisdiction" in every case, whether or not it is challenged. _Constantine v. Rectors & Visitors of George Mason Univ._, 411 F.3d 474, 480 (4th Cir. 2005).

The party "seeking to adjudicate a matter in federal court must allege and, when challenged, must demonstrate the federal

9

court's jurisdiction over the matter." Strawn v. AT&T Mobility LLC, 530 F.3d 293, 296 (4th Cir. 2008). The Motor Carriers first argue that Congress granted federal courts jurisdiction over their claim under the Interstate Commerce Commission Termination Act ("ICCTA"). Alternatively, they contend that the ICCTA preempts their state law breach of contract claim. The Motor Carriers argue, therefore, that we should create a cause of action under federal common law or they will have no forum in which to adjudicate this dispute.

B.

Issues of subject matter jurisdiction are questions of law which we review de novo. Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 815 (4th Cir. 2004) (en banc). Were we to reach the merits, we would review de novo the district court's grant of summary judgment, viewing the facts in the light most favorable to the non-moving party. See LeBlanc v. Cahill, 153 F.3d 134, 148 (4th Cir. 1998). Summary judgment is appropriate only where "there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

III.

Our jurisdiction in this case depends upon whether, absent a federal tariff, Congress intended federal courts to adjudicate

10

motor carriers' claims for unpaid freight charges under the ICCTA. "Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider." Bowles v. Russell, 551 U.S. 205, 212 (2007). As a court of limited jurisdiction, we will guard against reading Congress's grant of authority to the federal courts more broadly than intended. See Kokkonen v. Guardian Life. Ins. Co. of Am., 511 U.S. 375, 377 (1994).

The issues before us have their genesis in the deregulation of the trucking industry Congress effected by passing the ICCTA. Therefore, a brief history of the scope of federal regulation of the trucking industry is useful at the outset.

A.

In 1935, Congress passed the Motor Carrier Act, which extended to motor carriers the tariff system that banned price competition between railroads under the Interstate Commerce Act ("ICA"). See Munitions Carriers Conference, Inc. v. United States, 137 F.3d 1027, 1028 (D.C. Cir. 1998). Motor carriers were required to file a tariff that included their prices and conditions with the Interstate Commerce Commission. See 49 U.S.C. § 10762(a)(1) (repealed 1995). Motor carriers could charge each shipper only the rate in the filed tariff and could

11

not give any shipper "preferential treatment." See 49 U.S.C. §§ 10761(a), 10735(a)(1) (repealed 1995).

In Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd., 460 U.S. 533 (1983), the Supreme Court affirmed Louisville & Nashville R. v. Rice, 247 U.S. 201 (1918) where it "squarely held that federal-question jurisdiction existed over a suit to recover [unpaid freight charges]." Thurston, 460 U.S. at 555 ("A carrier's claim is, of necessity, predicated on the tariff- not an understanding with the shipper."); see also Illinois Steel v. Baltimore & O. R. Co., 320 U.S. 508, 511 (1944). In these cases, the parties' "'dut[ies] and obligation[s] . . . depend[ed] upon'" the federally filed tariff. Thurston, 460 U.S. at 555 (quoting Louisville, 247 U.S. at 202). Thus, the tariff was the "Act of Congress regulating commerce" under which we had federal question jurisdiction pursuant to 28 U.S.C. § 1337(a).

After motor carriers operated under the tariff-filing regime for sixty years, Congress determined that the trucking industry had become a "mature, highly competitive industry where competition disciplines rates far better than tariff filing and regulatory intervention." S. Rep. No. 104-176, at 10 (1995). Thus, Congress passed the ICCTA because pervasive regulation of the industry had "outlived its usefulness." Id.

When the ICCTA went into effect on January 1, 1996, it repealed price controls for all but two specialized areas of the trucking industry. Motor carriers transporting household goods or engaged in noncontiguous domestic trade[5] remained subject to the tariff-filing requirement. See 49 U.S.C. § 13701(a)(1)(A)-(B). In these two areas, Congress determined that price regulation was still in the public interest. Consumers and small shippers contracting to ship household goods would continue to be shielded from potential abuses. See S. Rep. No. 104-176, at 11. The tariff requirement in the area of noncontiguous domestic trade would facilitate intermodal transport. Id. at 10. All other tariffs on file were automatically voided by the ICCTA. See 49 U.S.C. § 13710(a)(4).

Congress did not, however, abandon all federal regulation of the motor carriers that were freed to engage in price competition. The Surface Transportation Board ("STB") maintained jurisdiction over all motor carriers who transport goods in interstate commerce and between the United States and its territories or a foreign country. 49 U.S.C. § 13501(1)(A)-(E). All motor carriers subject to the STB's jurisdiction must satisfy licensing requirements by meeting safety, employment,

---

[5]    Noncontiguous domestic trade is transportation "originating in or destined to Alaska, Hawaii, or a territory or possession of the United States." 49 U.S.C. § 13102(17).

13

and accessibility standards.  49 U.S.C. § 13902(a).  Congress's goal in passing the ICCTA was to "strike a good balance" between deregulation and "preserving very important safety and economic regulatory powers . . . to protect shippers against abuses that will not be remedied by competition."  141 Cong. Rec. 32406 (1995); see also S. Rep. No. 104-176, at 9 (1995)

Against this framework, we must determine whether Congress intended to grant federal courts jurisdiction over federally licensed motor carriers' claims for unpaid freight charges when they were not required to file a tariff.  We turn now to the question of whether the ICCTA provides such authority.

B.

We begin by examining 49 U.S.C. § 14101(b), which authorizes federally licensed motor carriers to enter into private contracts with shippers.  The Motor Carriers argue that this authorization alone is sufficient to establish our jurisdiction over their claim.

As in any case of statutory interpretation, we begin with an analysis of the statutory language.  Chris v. Tenet, 221 F.3d 648, 651-52 (4th Cir. 2000) (citing Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985)).  The meaning of a statutory provision is not to be determined in isolation; "we look not only to the particular statutory language, but to the statute as

14

a whole and to its object and policy." <u>Crandon v. United States</u>, 494 U.S. 152, 158 (1990) (internal citations omitted).

1.

Section 14101(b)(1) provides:

> In general.—A carrier providing transportation or service subject to jurisdiction under chapter 135 may enter into a contract with a shipper, other than for the movement of household goods described in section 13102(10)(A), to provide specified services under specified rates and conditions . . . .

49 U.S.C. § 14101(b)(1).

This section of the ICCTA authorizes motor carriers to privately negotiate their rates with shippers, replacing the prior tariff-filing requirement. In fact, this section authorizes one of the two categories of motor carriers still subject to the tariff-filing requirement, carriers involved in noncontiguous domestic trade, to contract around the federal rate schedule. <u>See</u> 49 U.S.C. § 13702(b). Section 14101(b)(1) only excludes motor carriers transporting household goods.

If a party to a contract authorized by § 14101(b)(1) wants to sue for breach of contract, § 14101(b)(2) provides:

> The exclusive remedy for any alleged breach of a contract entered into under this subsection shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree.

49 U.S.C. § 14101(b)(2).

15

The mere fact that Congress authorized motor carriers to privately negotiate rates in § 14101(b)(1) does not imply that Congress intended § 14101(b)(2) to federalize every resulting breach of contract claim. Section 14101(b)(2) more accurately reflects Congress's goal of reducing federal involvement in motor carriers' private contracts. The fact that the exclusive remedy for breach of contract in § 14101(b)(2) is judicial, rather than administrative, gains significance in contrast to the remedies available to motor carriers operating under a tariff. When their rates are based on a federal tariff, motor carriers can petition the STB for administrative remedies. See 49 U.S.C. § 13702(b)(6). When their rates are based on a private contract, however, the motor carriers can only sue in an "appropriate" court.

Of course, for a federal court to be the "appropriate" forum to adjudicate a dispute, the aggrieved party must establish a basis for our jurisdiction. See United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2009); cf. Ruckelshaus v. Sierra Club, 463 U.S. 680, 683 (1983) (defining "appropriate" as "specially suitable: fit, proper"). For example, although not satisfied in this case, the requirements for diversity jurisdiction are likely often met when motor carriers contract with shippers to transport goods given the interstate nature of the trucking industry. See 28 U.S.C. §

16

1332.[6] The Motor Carriers have established that they are subject to the STB's jurisdiction because they transport goods in interstate commerce. As a result, their contract with Klaussner was authorized by § 14101(b)(1). However, this authorization alone does not provide us with jurisdiction over their breach of contract claim.

2.

Comparing § 14706(d) to § 14101(b)(2) also helps to clarify the limited scope of the latter. Section 14706(a)(1)[7] provides that motor carriers are liable for goods damaged in transit. Section 14706(d) authorizes parties seeking damages against a motor carrier to file suit in "a United States district court or in a State court." 49 U.S.C. § 14706(d)(3). In every case brought under § 14706(a)(1), federal jurisdiction is established because the claimant is enforcing a federal statutory right.

---

[6] One of the threshold requirements to establish our jurisdiction under § 1332, complete diversity of citizenship between each plaintiff and each defendant, is not met in this case because Klaussner and all but one of the Motor Carriers are incorporated under North Carolina law. See Exxon Mobil Corp. v. Allapattah Services, Inc., 545 U.S. 546, 553 (2005); see also 28 U.S.C. § 1332(c)(1)(B) ("[A] corporation shall be deemed to be a citizen of every State . . . by which it has been incorporated").

[7] The Motor Carriers argue that § 14706(a)(1) establishes our jurisdiction over this case. However, this section addresses claims against motor carriers for damages. It does not apply to our case, where motor carriers have filed suit against a shipper to recover freight charges.

17

Thus, the limiting word "appropriate" does not appear in § 14706(d)(3).  Section 14101(b)(1), by contrast, authorizes motor carriers and shippers to enter into private contracts.  It does not provide either the motor carrier or the shipper with a federal statutory right to enforce in a routine breach of contract claim.  When operating under a private contract authorized by § 14101(b)(2) instead of a federal tariff, therefore, a party must first establish an alternative basis for our jurisdiction before we can adjudicate their dispute.  In this case, the Motor Carriers have failed to meet this threshold requirement.

## C.

We now turn to the sections of the ICCTA that directly address motor carriers' billing and collection practices to determine whether our jurisdiction can be established under one of these provisions.  See 49 U.S.C. § 13701 et seq.  Contrary to the Motor Carriers' arguments on appeal, these sections do not provide motor carriers with a federal cause of action when they sue a shipper for unpaid freight charges under a private contract.  We discuss each briefly.

### 1.

The Motor Carriers first argue that 49 U.S.C. § 13710(a)(1) is the functional equivalent of the tariff-filing requirement,

18

and therefore, provides a continuing basis for our jurisdiction. This section requires motor carriers to provide shippers with a written or electronic copy of "the rate, classification, rules, and practices, upon which any rate applicable to its shipment or agreed to between [the parties] is based." 49 U.S.C. § 13710(a)(1). When motor carriers' rates are based on a private contracting process, it is unclear how this provision would apply. Even if it did, this section is a disclosure requirement, and does not impose any obligations regarding the rates actually charged. It is not, therefore, the equivalent of a tariff requirement, and does not provide a basis for our jurisdiction in this case.

2.

The Motor Carriers next argue that their claim arises under § 13706, which defines consignee liability for the payment of freight rates. 49 U.S.C. § 13706(a)-(b). While this section does not expressly state that its application is limited to cases where a federal tariff is filed, Chapter 137's other provisions addressing motor carriers' rates only apply when there is a federal tariff. See, e.g., 49 U.S.C. § 13702; 49 U.S.C. § 13704. Further, the regulations governing motor carriers' collection of rates issued pursuant to chapter 137 are expressly limited to cases where a federal tariff is filed. See

19

49 C.F.R. § 377.101; 49 C.F.R. § 377.203(a)(2).[8] Even if § 13706 could apply in the absence of a federal tariff, this section does not apply to our facts. In this case, the Motor Carriers seek to recover from a shipper, or consignor, not a consignee. In sum, absent a federal tariff, the statutory requirements regarding the rates and collection practices of motor carriers in Chapter 137 are not implicated when a motor carrier files suit against a shipper to recover freight charges.

3.

This conclusion also negates the Motor Carriers' final argument for jurisdiction under the ICCTA. The Motor Carriers argue that the eighteen-month statute of limitations period that governs motor carriers' claims for unpaid freight charges under the ICCTA, 49 U.S.C. § 14705(a), establishes our jurisdiction over their claim. The Motor Carriers' argument puts the cart before the horse. For § 14705(a) to apply, motor carriers must first establish that their claim arises under the ICCTA. A statute of limitations period is not an independent grant of

---

[8] The Motor Carriers cite these regulations to support their argument for our jurisdiction in this case. Given their inapplicability in the absence of a federal tariff, this argument is without merit. We note briefly that the Motor Carriers also cite to the regulations issued pursuant to Chapter 138 of the ICCTA. These regulations apply only when a party files suit against a motor carrier, and therefore are not implicated by our facts. See 49 C.F.R. § 378.1.

jurisdiction.  In this case, we have not found, and the Motor Carriers have not alleged, a cause of action arising under the ICCTA.  Accordingly, we do not have jurisdiction under the ICCTA to decide this case.

IV.

In the alternative, the Motor Carriers argue that their state law breach of contract claim is preempted by § 14501(c)(1) of the ICCTA.  The Motor Carriers urge us, therefore, to create a cause of action under federal common law to establish our jurisdiction and provide a forum for their claim against Klaussner.  In any preemption analysis, "the purpose of Congress is the ultimate touchstone." Wyeth v. Levin, 555 U.S. 555, 565 (2009) (internal citations and quotations omitted).  We begin with the words of the statute which "necessarily contain[] the best evidence of Congress' pre-emptive intent." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993).  When a statute includes an express preemption clause, its presence generally "'implies that matters beyond that reach are not pre-empted.'" Washington Gas Light Co. v. Prince George's Cnty. Council, 711 F.3d 412, 420 (4th Cir. 2012) (quoting Cipollone v. Liggett Group Inc., 505 U.S. 504, 517 (1992)).  Further, "[f]ederalism concerns strongly counsel against imputing to Congress an intent to displace a whole panoply of state law . . . absent some

clearly expressed direction." <u>Custer v. Sweeney</u>, 89 F.3d 1156, 1167 (4th Cir. 1996) (internal quotation omitted).

Section 14501(c)(1) of the ICCTA preempts any state law or regulation "related to a price, route, or service of any motor carrier . . . ". 49 U.S.C. § 14501(c)(1). The Motor Carriers contend that the North Carolina common law that would decide this dispute in state court qualifies as "state law" under § 14501(c). The Motor Carriers argue, therefore, that the ICCTA preempts their claim because its outcome will affect their prices. In other words, in their view, Congress intended the phrase "related to" in § 14101(c)(2) to displace all state contract law that would impact motor carriers' prices. We are constrained to disagree.

Congress borrowed the preemption language in § 14501(c)(1) from the Airline Deregulation Act of 1978 ("ADA"). <u>Compare</u> 49 U.S.C. § 41713(b)(1) <u>with</u> 49 U.S.C. § 14501(1). Prior to the ICCTA's enactment, the Supreme Court broadly defined the phrase "related to" in the ADA to preempt all claims having "a connection with, or reference to" airline prices, routes, or services. <u>Morales v. Trans World Airlines Inc.</u>, 504 U.S. 374, 384 (1992). Congress was "fully aware of [the] Court's interpretation of that language" in <u>Morales</u> when it opted to include identical language in the ICCTA, and intended to provide the same protections against state regulation to motor carriers

22

as were provided to airlines in the ADA. See Rowe v. New Hampshire Motor Transport Ass'n, 552 U.S. 364, 370 (2008) (citing and quoting legislative history).

The broad preemptive scope of the phrase "related to," however, is not without limits. The Morales Court noted that "'[s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect." 504 U.S. at 390 (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 100 n.21 (1983)). In American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995), for example, the Supreme Court recognized an exception to preemption for routine breach of contract claims against airlines. American Airlines argued that a series of class actions filed in state court by participants in its frequent flyer program for breach of contract were preempted by the ADA. Id. at 230. The Court determined it was "[not] plausible that Congress meant to channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law, the range of contract claims relating to airline rates, routes, or services." Id. at 232. The Court noted that no state regulation of airlines was at issue, and that American had voluntarily entered into the frequent-flyer contracts with consumers. Id. at 229. Most importantly, the outcome of the case depended on an interpretation of the contract's terms, not on an interpretation

23

of any federal law or regulation. Id. at 229-31 ("A remedy confined to a contract's terms simply holds parties to their agreements."). Therefore, the plaintiffs could pursue their claims against American in state court.

In this case, as in Wolens, resolution of the dispute between the Motor Carriers and Klaussner depends upon the court's interpretation of the parties' contract. The outcome of the case turns on the meaning of the "Prepaid" designation and non-recourse provision in their bills of lading. No state law or regulation governing the Motor Carriers' prices, routes, or services is implicated. As analyzed above, no federal statute or regulation need be interpreted. The Motor Carriers' claim against Klaussner is a routine breach of contract case that is not preempted by § 14501(c)(1). Furthermore because, similarly to the ADA, the ICCTA "contains no hint" that Congress intended federal courts to adjudicate this category of contract disputes based on federal common law, we decline to do so in this case. Wolens, 513 U.S. at 232.

V.

Because we conclude that we do not have jurisdiction to adjudicate this appeal, we "do not and cannot express any opinion regarding the appeal's merits." United States v. Myers, 593 F.3d 338, 340 n.1 (4th Cir. 2010) (citing Constantine, 411

24

F.3d at 480). We have authority only to vacate the district court's opinion and remand with instructions to dismiss. Therefore, the decision below is

<u>VACATED AND REMANDED</u>
<u>WITH INSTRUCTIONS</u>.