[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10517
_____

D.C. Docket No. 1:10-cv-00375-CAP

UPS SUPPLY CHAIN SOLUTIONS, INC.,

Plaintiff - Appellee
Cross Appellant,

versus

MEGATRUX TRANSPORTATION, INC.,

Defendant - Appellant
Cross Appellee.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(May 8, 2014)

Before WILSON, Circuit Judge, and MIDDLEBROOKS,* and ALBRITTON,**
District Judges.

_____

\* Honorable Donald M. Middlebrooks, United States District Judge for the Southern
District of Florida, sitting by designation.
\*\* Honorable W. Harold Albritton III, United States District Judge for the Middle
District of Alabama, sitting by designation.

MIDDLEBROOKS, District Judge:

This case involves a pirated shipment of disk drives, two logistics contracts, and application of the Carmack Amendment, 49 U.S.C. § 14706, a federal law regulating the interstate transportation of goods.  It requires us to address the ability of intermediaries to negotiate limitations on liability, the sufficiency of proof of loss, and the scope of federal preemption with respect to a third-party logistic company's contract-based claim for attorney's fees.

## I.    Background

On September 18, 2009, a shipment of new and refurbished disk drives owned by Seagate Technology, LLC ("Seagate") was stolen while in transit. Although the identities of the thieves are not known, the cargo is presumed to have been stolen by drivers posing as employees of Stallion Carrier Corporation ("Stallion").  Unbeknownst to Seagate, and without authorization of its logistics provider, UPS Supply Chain Solutions, Inc. ("UPS"), Stallion had been subcontracted by the defendant, Megatrux Transportation, Inc. ("Megatrux"), to transport the disk drives from Los Angeles, California to McAllen, Texas.

Seagate had contracted with UPS to provide transportation, custom brokerage services, and warehousing and freight management services on an exclusive basis throughout the Americas for air, land, or sea.  The Global Logistics Service Provider Agreement ("GLSPA") between Seagate and UPS allowed UPS

2

to subcontract obligations under the contract to third parties, and limited the liability of UPS and its subcontractors to $100,000, except where the loss was due to gross negligence. The GLSPA was effective December 19, 2008, and continued until terminated by the parties.

UPS, in turn, had a non-exclusive contract with Megatrux for Megatrux to provide ground transportation services to UPS and its customers. However, pursuant to the Master Transportation Services Agreement ("MTSA") between UPS and Megatrux, dated August 14, 2009, Megatrux was not allowed to subcontract its work to others without the consent of UPS.[1] Despite this prohibition and without informing UPS, Megatrux subcontracted with individuals it thought to be associated with Stallion, a company it had not previously used, to haul the Seagate disk drives.

The MTSA between UPS and Megatrux contains several other provisions pertinent here. Section 10.1 provides:

> **Liability.** Full liability for risk of delay, loss or damage to cargo transported under this Agreement shall at all times remain with

---

[1] Section 5.5 of the MTSA provides in pertinent part:

> **Subcontractors.** Carrier shall not cause or permit any other person or entity to perform any of Carrier's obligations hereunder or cause or permit any shipment tendered hereunder to be transported by any other third-party carrier, in "substituted service" or other modes of transportation (each referred to herein as a "Subcontractor" and, collectively, as the "Subcontractors") without the prior written consent of UPS.

(MTSA, at 5).

3

Carrier while such items are in Carrier's possession, custody, or control, or the possession, custody or control of Subcontractors, and Carrier's liability for such delay, loss or damage shall be the Customer's actual loss or injury without regard to salvage, including delivery and freight handling charges.

(MTSA, at 8).  Section 15, entitled "INDEMNIFICATION," provides in pertinent part:

> Carrier shall indemnify and hold harmless UPS and its affiliates, and its or their officers, directors, employees and agents, from and against any and all loss, expense, damage, injury or claim, including attorneys' fees [], resulting from or occurring in connection with (a) the Services or any of Carrier's activities in connection with its performance of its obligations under this Agreement, including, without limitation, Carrier's use of UPS's or its customer's equipment; and (b) any breach of this Agreement . . . .

(MTSA, at 10).  Section 20.9 states in relevant part:

> **Entire Agreement; Amendment.**  This Agreement, including all Incorporated Documents, sets forth the full and complete understanding of the parties with respect to the matters herein and supersedes any and all prior or contemporaneous agreements or understandings, written or oral, between the parties as to the subject matter of this Agreement. *Any terms and conditions printed on transportation documents such as bills of lading or delivery receipts will not change or supersede the terms of this Agreement, and such documents will operate solely as receipts.*

(MTSA, at 13) (italicized emphasis added).  Finally, Section 20.10 provides: "Each Services Recipient is an intended third[-]party beneficiary of Carrier's obligations and liabilities under this Agreement and, as such, shall have the right to enforce this Agreement to the same extent as UPS."  (MTSA, at 13).

4

After the load was stolen, UPS agreed to pay Seagate $246,022 and, as consideration for payment by UPS, Seagate assigned to UPS its rights, claims, and causes of action against Megatrux and others arising out of the loss. Pursuant to the assignment, all sums recovered *in excess* of $246,022, less reasonable attorney's fees, should be payable to Seagate. Seagate reserved any rights, if any may continue to exist, to make further recovery from UPS. UPS then sued Megatrux for liability pursuant to the Carmack Amendment; breach of the MTSA contract, including its indemnification requirements; and negligence. UPS subsequently amended its complaint to add a claim for attorney's fees pursuant to a Georgia statute pertaining to vexatious litigation, as well as a claim for punitive damages pursuant to a Georgia statute allowing such in cases of willful misconduct or fraud.

Following a bench trial, the district court found in favor of UPS, concluding that under the Carmack Amendment, UPS was entitled to recover the full amount of the actual cargo loss, an amount totaling $461,849.82. The court concluded that the state law claims for breach of contract and negligence were preempted by the Carmack Amendment. The court also denied UPS's claim for attorney's fees under the indemnity provision in the MTSA, concluding that an award of attorney's fees would allow for an award higher than the plaintiff's actual loss or injury, an outcome inconsistent with the Carmack Amendment. In addition, the

5

court found that UPS was not entitled to fees under the Georgia statute because there had been a bona fide dispute between the parties.

On appeal, Megatrux argues that the district court erred in failing to limit damages to $100,000 pursuant to the provisions of the GLSPA or, alternatively, to $32,213.68 pursuant to the bills of lading. Megatrux also argues that the court erred in accepting customs invoices, photographs, and the condition of the disk drives that were recovered by Seagate's investigators after the theft as sufficient proof of the condition and contents of the stolen shipment. In its cross appeal, UPS contends that the Carmack Amendment does not preempt its claim for attorney's fees pursuant to the indemnification provisions of the MTSA.

## II.     Standard of Review

On an appeal following a bench trial, we review the district court's legal conclusions *de novo* and findings of fact for clear error. *Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1282 (11th Cir. 2006). The clear error standard is highly deferential, and "[a] factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007) (internal quotation marks omitted).

## III.     Discussion

6

*A.*

The Carmack Amendment was adopted to achieve uniformity in rules governing interstate shipments, including the rules governing injury or loss to property shipped. *Adams Express Co v. Croninger*, 226 U.S. 491, 506, 33 S. Ct. 148, 152, 57 L. Ed. 314 (1913).[2] The Carmack Amendment is a strict liability statute. When a shipper shows delivery of goods to a carrier in good condition and non-delivery or delivery in a damaged condition, there arises a prima facie presumption of liability. *See Chesapeake & O. Ry. Co. v. A. F. Thompson Mfg. Co.*, 270 U.S. 416, 422-23, 46 S. Ct. 318, 70 L. Ed. 659 (1926); *A.I.G. Uruguay Compania de Seguros*, *S.A. v. AAA Cooper Transp.*, 334 F.3d 997, 1003 (11th Cir.

---

[2] As a preliminary note, neither party has appealed application of the Carmack Amendment to the lost cargo, and Megatrux does not appeal its legal liability for the stolen shipment—only the amount of that liability. We therefore assume without deciding that the Carmack Amendment is applicable to the cargo claim.

However, a portion of the disk drives were shipped by sea from Malaysia to the Port of Los Angeles and then to UPS's facility in Carson, California. The Intermodal Waybill indicates that the cargo was to be shipped from Penang, Malaysia, to Carson California, and then to McAllen, Texas. The remainder were shipped by air freight from Singapore, Thailand, and China to Los Angeles, California, and then transferred to a DSD facility in Los Angeles. The Waybills indicate the cargo was to be shipped from Singapore, Thailand, and China to Los Angeles and then to McAllen, Texas. The cargo was picked up by the rogue drivers on September 16, 2009, in Los Angeles to be transported to McAllen, Texas. Because the cargo was to be shipped from Asia to Texas under one logistical plan created by UPS, application of the Carmack Amendment may be uncertain. *See Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 130 S. Ct. 2433, 177 L. Ed. 2d 424 (2010); *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 125 S. Ct. 385 (2004); *CNA Ins. Co. v. Hyundai Merchant Marine Co., Ltd.*, No. 12-6118, 2014 WL 1227776 (6th Cir. Mar. 26, 2014); *Altadis USA, Inc. v. Sea Star Line, LLC*, 458 F.3d 1288 (11th Cir. 2006); *Norfolk S. Ry. Co. v. Sun Chem. Corp.*, 735 S.E.2d 19 (Ga. Ct. App. 2012).

7

2003) (citing *Fine Foliage of Fla., Inc. v. Bowman Transp., Inc.*, 901 F.2d 1034, 1037 (11th Cir. 1990)).

A carrier of property in interstate commerce that loses a shipment is generally liable "for the actual loss or injury to the property caused by" the carrier. 49 U.S.C. § 14706(a)(1). "Actual loss or injury" is ordinarily measured by any reduction in market value at the place of destination. *See, e.g.*, *Chicago, M. & St. P. Ry. Co. v. McCaull-Dinsmore Co.*, 253 U.S. 97, 40 S. Ct. 504, 64 L. Ed. 801 (1920).

However, an exception to the general rule of full liability for loss exists where a shipper agrees with a carrier to limit the carrier's liability in order to obtain a reduced shipping rate. The Carmack Amendment permits a carrier to limit its liability "to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation." 49 U.S.C. § 14706(c)(1)(A). In addition to a declaration or agreement, the statute requires the carrier to provide "to the shipper, on request of the shipper, a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to between the shipper and the carrier, is based." *Id.* § 14706(c)(1)(B); *see also id.* § 13710.

8

We use a four-step inquiry to determine whether a carrier has effectively limited its liability under the Carmack Amendment. A carrier must: (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) give the shipper a reasonable opportunity to choose between two or more levels of liability; (3) obtain the shipper's agreement as to the choice of liability; and (4) issue a receipt or bill of lading prior to moving the shipment. *Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.*, 331 F.3d 834, 838-39, 841 (11th Cir. 2003); *see also Werner Enters., Inc. v. Westwind Maritime Int'l, Inc.*, 554 F.3d 1319, 1326 (11th Cir. 2009).[3]

In *Werner*, relying on the Supreme Court's decision in *Norfolk Southern Railway Company v. Kirby*, we recognized today's economic reality that interstate transportation often involves extended chains of parties and agreements. There we held that a carrier need not investigate upstream contracts between the shipper and the intermediary with whom the carrier is dealing, but, instead, is entitled to assume that an intermediary entrusted with goods may negotiate a limitation of liability. *Werner*, 554 F.3d at 1325.

Like this case, *Werner* involved a stolen shipment. The shipper, Nextel, arranged through intermediaries to have Werner, a common carrier, transport cell

---

[3] The first prong has been largely eliminated by statutory changes that abolished the Interstate Commerce Commission and replaced it with the Surface Transportation Board. Instead, carriers are now required to provide shippers on request with a written or electronic copy of the rates, classifications, rules, or practices applicable to the shipment or agreed to between the shipper and carrier. *See Werner*, 554 F.3d at 1326 n.6.

phones from a Motorola plant in Florida to a customs broker in Texas. *Id*. at 1321-32. Nextel insured the full value of the phones through its insurance company, Ace. *Id.* at 1321.

Nextel used Westwind Maritime to arrange transportation of the phones. Westwind in turn arranged for transportation of the phones through Transpro Logistics, which entered into a Broker Transportation Agreement with Werner. *Id*. at 1322. The Agreement incorporated Werner's tariff and indicated that unless full coverage was requested, a maximum of $200,000 liability per truckload would apply. *Id.* at 1322-23. Nextel never requested full liability coverage from Westwind, Westwind never requested full liability coverage from Transpro, which never invoked the full Carmack liability provision of Werner's tariff. *Id.* at 1323. We held that the limitation incorporated in the Brokerage Transportation Agreement between Werner and Transpro controlled regardless of the fact that Nextel had no actual knowledge of the limitation and no opportunity to negotiate the limitation. *Id*. at 1328.

This case is the mirror image of *Werner*. Instead of agreeing to a partial limitation, UPS, acting as intermediary for Seagate, negotiated the MTSA with Megatrux which requires full liability for risk of loss. We see no reason to depart from the rationale of *Kirby* and *Werner* where the intermediary negotiates for full liability rather than partial. Presumably, the rate agreed to by Megatrux would

10

have been premised on full liability.  The existence of liability limitations in the upstream contract between Seagate and UPS—a contract that Megatrux had no knowledge of or participation in—is irrelevant.  *See id.* at 1325.[4]

In short, Megatrux failed to show that the shipper was given a reasonable opportunity to choose between two or more levels of liability or that it had obtained agreement to any level below the Carmack Amendment's default measure of full liability.  *See Sassy Doll Creations, Inc.*, 331 F.3d at 842.  We therefore affirm the district court's finding of full liability.

*B.*

Megatrux also argues that the district court erred in concluding that UPS sufficiently established the contents of the stolen trailer.  The district court relied on customs invoices,[5] photographs of the subject shipment in the back of the thieves' trailer, and 368 disk drives that were recovered by Seagate's investigators

---

[4] In its litigation-inspired request to apply the GLSPA's limitation provision, Megatrux ignores that it is tempered by additional liability for gross negligence or willful misconduct.  UPS argues that this standard is met by the deliberate violation of the prohibition on subcontracting and entrusting the cargo to strangers.  The district court did not reach this issue because of its finding that the full liability requirement of the MTSA represented the shipper's choice of liability under the third prong of the *Sassy Doll* inquiry.

[5] These customs invoices were the main evidence relied on by the district court.  The court noted that "[t]hese customs invoices were made contemporaneously with the staging, packing, and packaging of the subject shipment and such invoices were relied upon by Seagate in the orderly administration of its business."  (Trial Ct. Order, at 9).

11

to conclude that UPS provided sufficient evidence of the condition and contents of the subject shipment.[6]

An element of a prima facie Carmack Amendment claim is proving that the cargo was delivered to the carrier in good condition. *A.I.G. Uruguay Compania de Seguros*, *S.A. v. AAA Cooper Transp.*, 334 F.3d 997, 1003 (11th Cir. 2003) (citations omitted). "When the shipment was lost, destroyed, or damaged to such extent that it is impossible to tell what was contained in the shipment, then the question is not only the original condition of the shipment, but also the *contents* of the shipment." *Id*. at 1005 (emphasis in original). Thus, we have required direct evidence of the "contents and condition of the shipment to prove a prima facie case." *Id.* "[D]ocuments cannot suffice for prima facie proof of contents in sealed containers. . . . [T]he established rule requir[es] the plaintiff to supplement documentary evidence with some form of direct evidence of the contents of a sealed container." *Id*. (internal quotation marks and citations omitted).

The district court relied upon *AAA Cooper* in finding that UPS met its burden. In that case, the plaintiff (an insurer subrogated to the interests of the shipper) sought to establish its claim regarding several shrink-wrapped pallets of

---

[6] The court noted that the photographs and the recovered disks were "strong corroborating evidence indicating that the customs invoices are accurate and trustworthy." (Trial Ct. Order, at 7).

Motorola cell phones by introducing packing invoices automatically generated by a

serial-number scanner as follows:

> When the particular phones to be packaged to fill the order are
> selected, their serial numbers are scanned into the Motorola system,
> and that record follows the order from station to station as it proceeds
> toward shipment. These serial numbers appear automatically on the
> invoice generated before the shipment leaves the facility. This record
> is made contemporaneously with the "sealing" of the phones inside
> the cartons that directly and without inference identifies the contents
> of that carton, even though we have no testimony of the individual
> responsible for scanning the phones or the supervisor, if any, with
> responsibility over the process by which the phones are scanned.

*Id*. at 1007.  We held that such automated records were "direct" evidence sufficient

to satisfy the plaintiff's burden to show the contents of the shipment.  Specifically,

we noted:

> When business records are routinely and systematically made
> contemporaneously with the packing and packaging of a particular
> shipment, and these documents clearly identify the specific contents
> of those shipments, then we perceive no problem in accepting that
> proof as the type able to meet the shipper's burden.  It is especially so
> where, as here, there is no incentive for the shipper to falsify the
> packing lists.

*Id*. at 1007-08.

We find no clear error in the district court's determination that the customs

invoices, photographs, and recovered disk drives provided sufficient evidence of

the condition and contents of the stolen shipment.  The customs invoices were

generated contemporaneously with shipment, carried penalties for falsification, and

Seagate paid duties based upon their contents.

13

*C.*

On cross appeal, UPS contends that Carmack preemption does not cover UPS's claim for the recovery of its attorney's fees pursuant to Section 15 of the MTSA, which is set forth above.  UPS argues that it is pursuing its attorney's fees based upon the separate right of indemnity in the MTSA—not pursuant to the Carmack Amendment on assignment from Seagate.  The district court found that "because the plaintiff's breach of contract claim is preempted by the Carmack Amendment, its request for attorney's fees pursuant to that claim is also preempted."  (Trial Ct. Order, at 13).

The district court's holding is understandable because we have characterized the preemptive effect of the Carmack Amendment to be quite broad.  "The Carmack Amendment embraces 'all losses resulting from any failure to discharge a carrier's duty as to any part of the agreed transportation.'"  *Smith v. United Parcel Serv.*, 296 F.3d 1244, 1249 (11th Cir. 2002) (quoting *Ga., F. & A. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 196, 36 S. Ct. 541, 544, 60 L. Ed. 948 (1916)).  "[S]eparate and distinct conduct rather than injury must exist for a claim to fall outside the preemptive scope of the Carmack Amendment."  *Id.*  We have not previously considered, however, whether an intermediary's contract-based indemnity claim for attorney's fees is preempted.[7]

---

[7] UPS describes itself as offering an array of services including transportation and freight,

State laws are preempted when they conflict with federal law.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000).  This includes cases where "compliance with both federal and state regulations is a physical impossibility," *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143, 83 S. Ct. 1210, 10 L. Ed. 2d 248 (1963), and where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941).  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Crosby*, 530 U.S. at 373, 120 S. Ct. at 2294.

Our analysis of the preemptive scope of the Carmack Amendment begins with *Adams Express Company v. Croninger*, 226 U.S. 491, 506, 33 S. Ct. 148, 152, 57 L. Ed. 314 (1913).  A shipper hired a common carrier to ship a diamond ring

---

contract logistics, customs brokerage, consulting services, and industry solutions.  *See* UPS Supply Chain Solutions, http://www.ups-scs.com (last visited Apr. 7, 2014).  In its briefing, UPS categorizes itself as a "freight intermediary," (Appellee's Reply Br. for Cross Appeal, at 11), and says that, with respect to its dealings with Megatrux, it acted as a "freight broker."  (Trial Doc. 106, at 2); *see also* 49 U.S.C. § 13102(2) (defining "broker").  Megatrux claims UPS acted as a "freight forwarder" and not as a "broker."  (Appellant's Br., at 5; Trial Doc. 108, at 5); *see also* 49 U.S.C. § 13102(8) (defining "freight forwarder").

A third-party logistics company may conduct multiple activities that are integrated to meet the needs of its customers and the crucial inquiry is in what capacity it is acting during any particular transaction.  *See Camp v. TNT Logistics Corp.*, 553 F.3d 502, 507 (7th Cir. 2009).  The district court made no finding with respect to this dispute and we likewise find it unnecessary to our resolution.

15

from Ohio to Georgia.  The ring was lost.  The bill of lading said that charges for delivery were based on the value of the shipment, that value was to be declared by the shipper, and that failure to declare the value would result in a rate based on a value of $50.  The shipper had not declared a value.  Nonetheless, he brought suit in a Kentucky state court for the full value of the ring.  Under Kentucky law, a contract to limit the shipper's recovery to a declared value was invalid.  The shipper prevailed.

The issue before the Supreme Court was whether a contract for interstate shipment, as evidence by the bill of lading, was governed by "the local law of the state, or by the acts of Congress regulating interstate commerce."  *Id*. at 500, 33 S. Ct. at 149.   Before the Carmack Amendment, the liability of common carriers for an interstate shipment of property was governed by either "the general common law"—as pronounced by state and federal courts—or the statutory laws of the states.  *Id*. at 504, 33 S. Ct. at 151.  Because of the various laws that might apply in a dispute arising from an interstate shipment, it was impossible for shippers and carriers to determine their risks and obligations with any reasonable certainty.  *Id*. at 505, 33 S. Ct. at 151-152.  The Carmack Amendment "made an end to this diversity, for the national law is paramount and supersedes all state laws as to the

16

rights and liabilities and exemptions created by such transactions." *Id*. at 505, 33 S. Ct. at 152.[8]

Although the amount of money at issue serves as a quaint reminder of a distant past, a Supreme Court decision decided the year after *Croninger* provides significant guidance.  In *Missouri, Kansas, & Texas Railway Company of Texas v. Harris*, 234 U.S. 412, 34 S. Ct. 790, 58 L. Ed. 1377 (1914), a shipper recovered $3.50 for loss of freight by a railroad, but the judgment included an award of $10.00 in attorney's fees awarded pursuant to a Texas statute.  The railroad argued that the law was preempted by the Carmack Amendment.

The Supreme Court disagreed: "[T]he Texas statute . . . does not in anywise either enlarge or limit the responsibility of the carrier for the loss of property intrusted [sic] to it in transportation, and only incidentally affects the remedy for enforcing that responsibility." *Id.* at 420.  "The local statute . . . does not at all

---

[8] The Supreme Court also considered the scope and application of the Amendment's savings clause, which provides: "Except as otherwise provided in this part, the remedies provided under this part are in addition to remedies existing under another law or common law."  49 U.S.C. § 15103.  The savings clause, explained the Court:

> was evidently only intended to continue in existence such other rights or remedies for the redress of some specific wrong or injury, whether given by the interstate commerce act, or by state statute, or common law, not inconsistent with the rules and regulations prescribed by the provisions of this act. . . . [I]t could not in reason be construed as continuing in a shipper a commonlaw right the existence of which would be inconsistent with the provisions of the act.  In other words, the act cannot be said to destroy itself.

*Croninger*, 226 U.S. at 507, 33 S. Ct. at 152.

17

affect the ground of recovery, or the measure of recovery; it deals only with a question of costs . . . ." *Id.* at 421-422.

The following year in a decision by Justice Holmes, the Court considered a South Carolina law which imposed a $50 penalty for failure to pay claims in a timely manner. *Charleston & W. Carolina Ry. Co. v. Varnville Furniture Co.*, 237 U.S. 597, 35 S. Ct. 715, 59 L. Ed. 1137 (1915). The Court distinguished its attorney's fee holding in *Harris* in finding the South Carolina statute preempted:

> But, apart from the effect being only incidental, the ground relied upon was that the [Texas] statute did not "in any way enlarge the responsibility of the carrier" for loss or "at all affect the ground of recovery, or the measure of recovery" []. The South Carolina act, on the other hand, extends the liability to losses on other roads in other jurisdictions, and increases it by a fine difficult to escape. It overlaps the Federal act in respect of the subjects, the grounds, and the extent of liability for loss.

*Id.* at 603, 35 S. Ct. at 716 (quoting *Harris*, 234 U.S. at 420).

The distinction between affecting liability for losses as opposed to the expense of recovery was again the focus of Justice Holmes in *Dickinson v. Stiles*, 246 U.S. 631, 38 S. Ct. 415, 62 L. Ed. 908 (1918). That case involved a claim that a lien authored by a Minnesota statute for attorney's fees was invalid because of preemption by an act of Congress relating to the liability of carriers by railroad to their employees. The Court rejected the claim as follows:

> [C]ases that declare that the acts of Congress supersede all state legislation on the subject of the liability of railroad companies to their [employees] have nothing to do with the matter. The Minnesota

18

statute does not meddle with that.  It affects neither the amount recovered nor the persons by whom it is recovered, nor again the principles of distribution.  It deals only with a necessary expense of recovery.  Congress cannot have contemplated that the claims to which its action gave rise or power would be paid in all cases without litigation, or that suits would be tried by lawyers for nothing, yet it did not regulate attorney's fees.  It contemplated suits in state courts and accepted state procedure in advance.  We see no reason why it should be supposed to have excluded ordinary incidents of state procedure.

*Id*. at 632-33, 38 S. Ct. at 416 (internal citations omitted).

Since these early Supreme Court decisions there is surprisingly sparse case law pertaining to preemption of claims for attorney's fees.  With respect to state statutes providing for attorney's fees in freight cases, only two circuits have dealt with the issue.  The Tenth Circuit relied upon *Harris* in holding that an Oklahoma attorney's fee statute does not "substantively enlarge the responsibility of the carrier," and therefore is not preempted by the Carmack Amendment.  *See A.T. Clayton & Co., Inc. v. Missouri-Kansas-Texas R.R. Co.*, 901 F.2d 833, 835 (10th Cir. 1990).  The court found the statute "incidental to and consistent with the overall purpose of the Carmack Amendment since it promotes settlement, encourages small well-founded claims, and discourages unnecessary litigation." *Id.*[9]

---

[9] Relying on the Supreme Court's holding in *Harris*, state courts in Oklahoma, Idaho, Nevada, and Oregon have also determined that a generally applicable attorney's fee statute is not preempted by the Carmack Amendment. *See AME, Inc. v. Consolidated Freightways*, 783 P.2d 499 (Okla. Civ. App. 1989); *Pac. Intermountain Express Co. v. Leonard E. Conrad, Inc.*, 502 P.2d 106 (Nev. 1972); *Rungee v. Allied Van Lines, Inc.*, 449 P.2d 378 (Idaho 1968);

The analysis becomes more muddled by a series of decisions involving a Texas statute, which ironically was a successor to the statute found to be not preempted by the Supreme Court in *Harris*.  The Texas law, which has since been repealed, provided that if a claim for lost or damaged freight was not paid within thirty days, then recovery would include, in addition to the claim and costs, a reasonable attorney's fee.  In *Thompson v. H. Rouw Co.*, 237 S.W.2d 662 (Tex. Civ. App. 1951), the Court of Civil Appeals of Texas considered application of the statute to an interstate shipment of carrots delivered to a carrier in Texas to be delivered to Missouri.  After a series of diversions, the carrots ended up being delivered to Pennsylvania in a deteriorated condition.  *Id*. at 664.

The Texas court distinguished *Harris* on two grounds: first, that in *Harris*, the statute had been applied to an interstate shipment when the goods were damaged within the state of Texas; and second, that the predecessor statute permitted only a nominal or limited fee on small claims.  Concluding that shippers should not have the privilege of shopping among the states for forums that would allow additional recovery, the Court of Civil Appeals disallowed the claim for attorney's fees.  *Id*. at 666.  "Texas can not [sic] extend the interstate carrier's liability for losses, and certainly not to losses on other roads in other states."  *Id*.

---

*Troute v. Aero Mayflower Transit Co., Inc.*, 718 P.2d 745 (Or. 1986).

Application of the Texas attorney's fee statute then arose in connection with a Fifth Circuit decision, *Strickland Transportation Company, Inc. v. American Distributing Company*, 198 F.2d 546 (5th Cir. 1952).  The case itself was relatively straightforward.  The plaintiff was a distributor of pinball machines and agreed to sell ten machines to an out-of-state buyer for $3,000.  *Id*. at 548.  The machines were not to be inspected or delivered until they were paid for.  The machines traveled from Texas to South Carolina. *Id.*  Upon arrival, the driver for the connecting carrier did not ask for payment and it was not tendered, but nevertheless five of the fifteen crates were unloaded on the sidewalk in front of the purchaser's place of business.  *Id.*  The purchaser's employees were able to see that there was a hole in one of the machines, some of the crates were broken, and the machines seemed dirty and scraped along their side.  *Id.*  The remaining ten crates were never unloaded, but the purchaser's employees rejected the entire shipment and told the driver to reload the unloaded crates, which he did.  *Id.*  The rejected shipment was returned to the connecting carrier's warehouse where it remained at the time of trial.  *Id.*

The shipper sued the carrier, alleging that the unloading of the five crates constituted delivery in violation of the terms of the bill of lading, which required payment first, and, together with the unauthorized inspection, caused damage in

the amount of the unpaid purchase price.  *Id.*  The trial court found in favor of the shipper and the carrier appealed.  *Id.* at 548-49.

The Fifth Circuit reversed, concluding that, even assuming an unauthorized inspection, "we are clear to the opinion that there was no such delivery or the conversion thereof as to make the carrier liable for the value of the goods."  *Id.* at 549.  The court held that the shipper could not reject return of the goods and recover their full value, but could only hold the carrier responsible for any actual damage.  *Id.* at 548-49.

Before considering the merits of the appeal, however, the Fifth Circuit requested briefs of the parties in a preliminary per curiam opinion that is quoted within the *Strickland* opinion.  *See id.* at 546-47.  The case had been removed from Texas state court and the question was whether the amount in controversy exceeded the $3,000 exclusive of costs necessary for removal jurisdiction.  The unpaid purchase price being sought was $3,000 and the amended complaint sought that amount together with $1,000 in attorney's fees pursuant to the Texas attorney's fee statute.  Stating that since the Texas Court of Civil Appeals had held that the Texas statute could not extend the carrier's liability for loss, and because claimed attorney's fees could not be considered for jurisdictional purposes where there is no legal basis for recovery, the Fifth Circuit concluded that "it is apparent to a legal certainty that the suit cannot involve the amount necessary to confer

22

jurisdiction on the district court." *Id*. at 547.  The Court indicated that since jurisdiction must affirmatively appear from the record, it could not presume that the face of the complaint disclosed the necessary jurisdictional amount and the case should have been remanded. *Id*.  Nevertheless, at the urging of the parties, and since the Court would have original jurisdiction had the case been filed in federal court, the Fifth Circuit proceeded to its merits determination. *Id*.

It is necessary to carefully scrutinize *Strickland* because, despite the Supreme Court's decision in *Harris* and any inferences we might draw from its reasoning, we are obligated to follow our own prior precedent.  *See Offshore of the Palm Beaches, Inc. v. Lynch*, 741 F.3d 1251, 1256-57 (11th Cir. 2014); *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981); *see also Atl. Sounding Co., Inc. v. Townsend*, 496 F.3d 1282, 1284 (11th Cir. 2007).  The question then becomes: what is *Strickland*'s holding?

"The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision." *United States v. Hunter*, 172 F.3d 1307, 1310 (11th Cir. 1999) (Carnes, J., concurring).  Moreover, the prior precedent rule does not require us to follow language of the accompanying opinion which is unnecessary to the decision.  *Id.*; *see also McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1315 (11th Cir. 1998)

(Carnes, J., concurring) (explaining why "dicta in our opinions is not binding on anyone for any purpose").

*Strickland* does not discuss Carmack preemption, much less the scope of that preemption; its holding, if there is any holding at all,[10] is that the amount necessary for removal jurisdiction was not apparent on the face of the complaint by operation of a Texas state court decision construing a Texas statute. The rationale of the Texas Court of Civil Appeals in declining to apply *Harris*, while it may have been persuasive to the Fifth Circuit's result, is not part of *Strickland* Court's holding.[11]

Moreover, this case does not require us to decide whether a state's attorney's fee statute survives Carmack preemption. Instead, we consider the enforcement of an indemnity clause in an ongoing contract between a logistics company and a motor carrier. The question therefore is whether UPS's claim for indemnification

---

[10] Since the Fifth Circuit, after the jurisdictional briefing, decided that it had original jurisdiction, proceeded to address the merits, it mattered not at all to the disposition of the appeal whether the jurisdictional amount appeared on the face of the amended complaint at the time of removal. Accordingly, all of the Court's comments about the issue are arguably dicta. *See McDonald's Corp.*, 147 F.3d at 1314-15 (Carnes, J., concurring).

[11] Since *Strickland*, the Fifth Circuit has addressed application of the Texas attorney's fee statute in interstate freight cases on three occasions. In *Missouri Pacific Railroad Company v. Center Plains Industries, Inc.*, 720 F.2d 818 (5th Cir. 1983), without discussing preemption, the Fifth Circuit found "the [*Strickland*] decision disallowing recovery of attorney's fees in freight damage suits to be persuasive." *Id*. at 819. In *Farmland Industries, Inc. v. Andrews Transport Co.*, 888 F.2d 1066 (5th Cir. 1989), another case where the Carmack Amendment was not discussed, the Fifth Circuit allowed attorney's fees under the Texas statute in a breach of contract action. In *Accura Systems, Inc. v. Watkins*, 98 F.3d 874 (5th Cir. 1996), the Fifth Circuit reversed and vacated an award of attorney's fees "[i]n light of" the *Strickland* holding. *Id*. at 877. The court also references a lower court decision distinguishing the Tenth Circuit's decision in *Clayton* "because the Oklahoma state courts, unlike the Texas state courts, have held that the state attorney's fee statute is not preempted by the Carmack Amendment." *Id*.

24

arising from the MTSA falls within the Carmack Amendment's field of implied preemption. We conclude that it does not.

We have previously said that "situations may exist in which the Carmack Amendment does not preempt all state and common law claims." *Smith*, 296 F.3d at 1248. Significantly, both the Supreme Court in *Kirby* and our decision in *Werner* point out that a cargo owner retains the right to sue an intermediary who fails to protect itself by negotiating a liability limitation. *See Kirby*, 543 U.S. at 35; *Werner*, 554 F.3d at 1325. Does it not follow that an intermediary should be able to seek indemnification from a counterparty that ignores its obligations under contract, thereby exposing the intermediary to suit?

As the Supreme Court has held, attorney's fees do not enlarge or limit the responsibilities of the carrier for loss of property. Nor does a claim for attorney's fees pose an obstacle to the accomplishment of the Amendment's purpose.

That is decidedly so in the context presented here. "A remedy confined to a contract's terms simply holds parties to their agreements . . . ." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 229, 115 S. Ct. 817, 824, 130 L. Ed. 2d 715 (1995). "The stability and efficiency of the market depend fundamentally on the enforcement of agreements freely made, based on needs perceived by the contracting parties at the time." *Id.* at 230 (quoting Br. for United States as *Amicus Curiae* 23). In the *American Airlines* case, the Supreme Court found that the Airline Deregulation Act

25

of 1978 preempted a state law consumer fraud statute, but allowed an individual breach-of-contract action to proceed: "We do not read the ADA's preemption clause, however, to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." *Id.* at 228; *see also Cipollone v. Ligett Grp., Inc.*, 505 U.S. 504, 526, 112 S. Ct. 2608, 2622, 120 L. Ed. 2d 407 (1992) (plurality opinion) ("a common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a 'requirement . . . *imposed under State law*' within the meaning of [the Cigarette Labeling and Advertising Act]"); *Gaines Motor Lines, Inc. v. Klaussner Furniture Indus., Inc.*, 734 F.3d 296, 306-07 (4th Cir. 2013) (motor carrier's breach of contract claim against shipper for unpaid freight charges not preempted by the Interstate Commerce Commission Termination Act).

A carrier that agrees to indemnify an intermediary for attorney's fees faces no more of an obligation than it has expressly chosen to assume. Enforcement of a self-imposed undertaking poses no risk of patchwork regulation or different demands in different jurisdictions.[12]

---

[12] While no federal appellate decision has addressed this issue, several courts have held that indemnity contracts between brokers and carriers are not preempted by the Carmack Amendment. *See, e.g.*, *Exel, Inc. v. S. Refrigerated Transport, Inc.*, No. 2:10-cv-994, 2012 WL 3064106 (S.D. Ohio July 27, 2012); *InTransit, Inc. v. Excel N. Am. Road Transport, Inc.*, 426 F. Supp. 2d 1136 (D. Or. 2006); *Edwards Bros., Inc. v. Overdrive Logistics, Inc.*, 581 S.E.2d 570 (Ga. Ct. App. 2003); *but see Dominion Res. Servs., Inc. v. 5k Logistics, Inc.*, No.

Finally, the purpose of the indemnification clause of the MTSA was not for transportation of a specific item of freight, but rather in connection with ongoing business dealings between two sophisticated parties.  It governs a commercial relationship and extends beyond any particular shipment of goods.  UPS does not seek indemnification pursuant to a bill of lading or the Carmack Amendment; rather, it seeks indemnification pursuant to its separate and ongoing agreement with Megatrux.  Specifically, UPS alleges that by subcontracting with Stallion, Megatrux was in direct violation of express terms of the MTSA.  If proven, this breach would be separate and distinct from the loss of cargo and would have exposed UPS to legal jeopardy with its customer; caused UPS to make payment to Seagate; required expenditure of attorney's fees to effect recovery; and triggered the indemnification provisions of the contract.  The district court erred in finding UPS's claim for indemnification of attorney's fees to be preempted by the Carmack Amendment.

## IV.    Conclusion

For the foregoing reasons, we **AFFIRM** the district court's ruling that Megatrux bears full liability for Seagate's actual loss of $461,849.42 and its finding that UPS sufficiently proved the contents of the subject shipments.  We **REVERSE** the determination that UPS's claim for attorney's fees under the

---

3:09-cv-315, 2010 WL 679845 (E.D. Va. Feb. 24, 2010).

indemnification clause of the MTSA is preempted and **REMAND** for further

proceedings consistent with this opinion.