[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-11887
Non-Argument Calendar
_____

D.C. Docket No. 1:17-cv-22646-KMW

ATLANTIC SPECIALTY INSURANCE COMPANY
a.s.o HUTSON, INC.,
HUTSON, INC.,

Plaintiffs - Appellees,

versus

DIGIT DIRT WORX, INC.,

Defendant - Third Party Plaintiff - Appellant,

NATIONAL INDEMNITY COMPANY OF THE SOUTH,

Third Party Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 5, 2019)

Before ROSENBAUM, BRANCH, and FAY, Circuit Judges.

PER CURIAM:

This case involves a combine harvester that was irreparably damaged during transportation from Kentucky to Florida. The combine's owner, Hutson, Inc. ("Hutson"), hired Defendant-Appellant Digit Dirt Works ("Digit") through an intermediary to transport the combine by truck. Less than a mile into its journey, the combine fell off the side of the trailer during a turn. The impact rendered the combine inoperable. Hutson filed a claim with its insurer, Plaintiff-Appellee Atlantic Specialty Insurance Company ("Atlantic"), which paid Hutson the value of the combine and then filed this lawsuit against Digit to recover its losses under the Carmack Amendment, 49 U.S.C. § 14706. Digit defended the lawsuit on two grounds: (1) the accident was caused by Hutson's negligence, not its own; and (2) its liability, if any, was limited to $100,000. The district court rejected Digit's arguments and entered summary judgment in favor of Atlantic in the amount of $201,391.40. Digit appeals. For the reasons that follow, we vacate and remand for further proceedings.

**I.**

Hutson is an authorized dealer of John Deere equipment. In 2014, Hutson contacted a transportation broker, Logistics Dynamics, Inc. ("LDI"), to arrange transportation of a 39,000-pound 2011 John Deere 9870 STS Combine ("Combine")

2

from Russellville, Kentucky, to Jacksonville, Florida. LDI, in turn, hired Digit and provided the terms of shipment through a document titled "Rate Confirmation," which was signed by Digit. The Rate Confirmation listed the shipping rate ($3,100 flat rate), the commodity (the Combine), the weight (39,000 lbs.), the necessary equipment (48' removable gooseneck trailer), and the insurance value ($100,000), and it directed Digit to "Contact Matt Cassidy for loading" at Hutson's facility on July 26, 2014.

On July 26, 2014, Digit's driver arrived at Hutson's Russellville facility with a flatbed trailer. At that time, the Combine was in good working order. The Combine was loaded onto the flatbed trailer and secured with chains. The central dispute in this case concerns the loading of the Combine, which is covered in more detail below. Once the Combine was loaded and secured, Digit issued or accepted a bill of lading and departed for Jacksonville. The bill of lading permitted the shipper to declare the value of the shipment, but that space was left blank.

Less than a mile from Hutson's facility, the Combine fell off the trailer as Digit's driver made a left-hand turn after stopping at a stoplight. The impact rendered the Combine unusable for its intended purpose. Hutson submitted a claim with its insurer, Atlantic, which paid Hutson a total of $237,520.40, based on the value of the Combine ($239,000), plus the cost of reloading it after the fall ($3,520.40), minus a deductible paid by Hutson ($5,000). After selling the Combine

3

for salvage ($44,476), Atlantic pursued recovery of its remaining losses from Digit, ultimately filing this lawsuit as subrogee of Hutson under the Carmack Amendment, 49 U.S.C. § 14706pol.

**A.**

Following discovery, Atlantic moved for summary judgment and submitted a supporting declaration from Jim Gilliam, the "Safety and Compliance Coordinator" at Hutson. Gilliam testified about the loading of the Combine. He stated that two Hutson employees, "under D[ig]it's driver's supervision," "drove the Combine onto the trailer, jacked it up, removed its wheels and tires, and set the Combine back down on 'combine blocks.'" Thereafter, Digit's driver secured the Combine to the trailer using four chains—two chains per axle—with no further involvement from Hutson's employees. Gilliam opined that Digit's driver should have used twelve chains to secure the Combine, "as indicated by a diagram visibly located on the steps leading to the cab of the Combine," and that inadequate chaining "placed an undue amount of stress on the left-side chains as the driver negotiated that left-hand turn, causing the Combine to overturn onto the roadway."

Digit filed a response supported by a declaration from Donald Garside, Digit's president, owner, and custodian of books and records. According to Garside, Digit was retained by LDI "to perform carriage of this shipment as a 'no-touch,' 'shipper-loaded' load." In other words, Digit's driver was "not to be responsible for the

4

supervision of the loading, blocking or bracing of the shipment." After two Hutson employees loaded and blocked the Combine onto the trailer, they instructed the driver "as to how to set the chains, and he followed their instructions with precision." The chaining complied with applicable Department of Transportation ("DOT") regulations. Digit's driver departed after the Hutson employees confirmed that the Combine was properly secured.

Garside further testified that improper blocking, not improper chaining, caused the Combine to fall off the trailer. Citing post-accident photographs of the Combine and trailer, Garside asserted that the blocks under the Combine were improperly placed inside of the Combine's jack points, creating too narrow of a base for the top-heavy Combine. Because the base was too narrow, the Combine tipped more easily when the trailer turned, placing undue stress on the chains and causing them to break. Garside testified that "[p]roper placement of the blocking"—either at or outside the jack points—would have prevented the accident.

Finally, as to the Rate Confirmation's statement that the insurance value of the shipment was $100,000, Garside testified that Digit had advised LDI previously that it did not carry any load with a value in excess of $100,000 without prior notice and an additional cargo policy in place.

In reply, Atlantic submitted new evidence in the form of a declaration from Chester Dulworth, one of the two Hutson employees involved in loading the

5

Combine, and a second declaration from Gilliam. In relevant part, Dulworth testified that he and the other Hutson employee, Steven Coleman, set the Combine on blocks underneath the Combine's four jack points, and that he and Coleman had no "further involvement with the subsequent bracing or securing of the Combine." Specifically, they did not instruct Digit's driver "as to the proper chaining and securing of the Combine to the trailer." Dulworth noted that a chaining diagram was clearly visible on the Combine.

Digit requested leave to file a surreply because Atlantic made new arguments and attached additional testimony "to which [Digit] is entitled a response." The district court denied this motion in a paperless order entered on the docket because Atlantic "raise[d] no new arguments that justify the filing of a surreply."

**B.**

On December 4, 2018, the district court granted summary judgment to Atlantic. In its order, the court began by resolving two evidentiary issues.

First, the district court found that Gilliam's and Garside's "statements about what occurred during the loading and securing of the Combine" were inadmissible hearsay. According to the court, neither Gilliam nor Garside witnessed the loading of the Combine, so they had no personal knowledge, "nor d[id] they indicate that the individuals who personally witnessed the loading of the Combine would be able to testify as to those statements at trial."

6

Second, the district court excluded Gilliam's and Garside's opinions about "what caused the Combine accident." Because Gilliam and Garside "deduce[d] a cause of accident based on a specialized (and, seemingly, speculative and conjectural) reading of the blocks and chains in the [post-accident] photographs," the court concluded that expert testimony was necessary "to determine if the photos reveal anything about the cause of the accident." But neither Gilliam nor Garside were designated as experts, so the court excluded their opinions as to cause as inadmissible lay-opinion testimony.

The district court then found, based on what it described as "undisputed facts," that Atlantic had established a prima facie case of liability under the Carmack Amendment and that Digit had failed to rebut that case by proving that (a) it was free from negligence and (b) the damage was caused by an excusable factor. Specifically, the court concluded the following: (1) there was no evidence Hutson was responsible for loading and securing the Combine; (2) there was no evidence that improper block placement was the sole, or even a possible, cause of the accident; and (3) there was no evidence to contradict Dulworth's testimony that Digit's driver did not place the chains at the direction of Hutson employees. As to the facts surrounding the loading and securing of the Combine, the court relied primarily on Dulworth's declaration.

7

Finally, the district court concluded that Digit's liability had not been limited by the Rate Confirmation, which listed an insurance value of $100,000. Accordingly, the court found that Atlantic was entitled to recover the "actual loss or injury" to the property.

Digit timely moved for reconsideration and submitted a declaration from its driver, Paul Hunziker. Digit argued, among other things, that the district court erred in granting summary judgment based on evidence—specifically Dulworth's declaration—to which it had no opportunity to respond. Digit maintained that Hunziker's declaration, which was largely consistent with Garside's earlier declaration, contradicted Dulworth's declaration and created genuine issues of material fact that precluded summary judgment.

The district court denied Digit's motion for reconsideration. In relevant part, the court noted that the motion for leave to file a surreply did not mention Hunziker or the importance of his testimony. Further, the court stated that it "did not grant summary judgment on the basis of the Dulworth declaration." Finding that the Hunziker declaration could have been introduced earlier, the court struck it from the record. Digit now appeals.

## II.

We review *de novo* the grant of summary judgment, viewing the evidence and drawing all reasonable inferences in favor of the nonmoving party—here, Digit.

8

*Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Guevara*, 920 F.3d at 720 (quotation marks omitted).

## III.

This case is governed by the Carmack Amendment, which was enacted "to achieve uniformity in rules governing interstate shipments, including the rules governing injury or loss to property shipped."  *UPS Supply Chain Solutions, Inc. v. Megatrux Transp., Inc. ("UPS Supply")*, 750 F.3d 1282, 1285 (11th Cir. 2014).  As a general rule, it "makes common carriers liable for actual loss of or damage to shipments in interstate commerce," *A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp. ("AIG Uruguay")*, 334 F.3d 997, 1003 (11th Cir 2003), thereby "protect[ing] shippers against the negligence of interstate carriers," *Fine Foliage of Fla., Inc. v. Bowman Transp., Inc.*, 901 F.2d 1034, 1037 (11th Cir. 1990).

To establish a prima facie case of liability under the Carmack Amendment, the shipper must show three things: (1) the goods were delivered to the carrier in good condition; (2) the goods were damaged during transit; and (3) a specified amount of damages resulted.  *AIG Uruguay*, 334 F.3d at 1003.  The burden then

9

shifts to the carrier to prove both that (1) it was free from negligence and (2) the damage to the cargo was caused by one of five excusable factors. *Id.* The five excusable factors are (a) an act of God; (b) the public enemy; (c) the act of the shipper; (d) public authority; and (e) the inherent nature of the goods. *Id.*

If the carrier cannot meet this burden, liability is established, and the question "then becomes the amount of damages and, usually, whether the carrier legitimately limited its liability for the shipment to a specified value or amount." *Id.* As a general rule, a carrier is "liable 'for the actual loss or injury to the property caused by' the carrier." *UPS Supply*, 750 F.3d at 1286 (quoting 49 U.S.C. § 14706(a)(1)). But an exception to full liability exists "where a shipper agrees with a carrier to limit the carrier's liability in order to obtain a reduced shipping rate." *Id.* Specifically, the Carmack Amendment permits a carrier to limit its liability "to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation." 49 U.S.C. § 14706(c)(1)(A).

There is no dispute that Atlantic established a prima facie case of liability under the Carmack Amendment. Specifically, Atlantic proved that (1) Digit received the Combine in good condition; (2) the Combine was damaged during transit; and (3) a specified amount of damages resulted. Accordingly, Digit is liable unless it can prove that it was free from negligence and that, as relevant here, the

damage was caused by Hutson. *AIG Uruguay*, 334 F.3d at 1003. And if Digit is liable, the question becomes whether it "legitimately limited its liability for the shipment to a specified value or amount." *Id.*

Digit makes three arguments on appeal. First, it contends that the district court erred by refusing to give it a chance to respond to materials presented for the first time in Atlantic's reply brief and then granting summary judgment on the basis of that evidence. Second, it argues that the court improperly disregarded Garside's testimony on certain matters. Third, it maintains that the Rate Confirmation limited its liability to $100,000. We address each argument in turn.

## A.

This Circuit recognizes "the importance of giving the nonmovant a meaningful opportunity to respond to a motion for summary judgment." *Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512, 1516 (11th Cir. 1990) (discussing former Rule 56(c), Fed. R. Civ. P.). Because summary judgment is a final disposition on the merits, courts should not grant summary judgment based on arguments or evidence to which the nonmoving party has not had a reasonable and meaningful opportunity to respond with contrary argument or evidence. *See id.* at 1516–17.

As we see it, the same principle applies whether new evidence is submitted with the initial summary-judgment motion or, as here, in a reply brief. And we agree with our sister circuits that "[w]here new evidence is presented in a reply to a motion

11

for summary judgment, the district court should not consider the new evidence without giving the movant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (*quoting Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990)); *see also Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481–82 (6th Cir. 2003) (district courts must "allow the nonmoving party to respond" when "the moving party submits in a reply brief new reasons and evidence in support of its motion for summary judgment"); *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998) ("[W]hen a moving party advances in a reply new reasons and evidence in support of its motion for summary judgment, the nonmoving party should be granted an opportunity to respond." (citing *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 410 (1st Cir. 1985))).

When faced with a reply brief that offers new evidence, we, like the Tenth Circuit, conclude that the district court has two permissible courses of action. It can either (1) permit the nonmoving party to file a surreply or (2) refrain from relying on any new material contained in the reply brief. *Beaird*, 145 F.3d at 1164. But it may not preclude the nonmoving party from filing a surreply and then grant summary judgment based on new material presented only in the reply brief. Here, though, that is what happened. Though the district court denied Digit an opportunity to file a surreply, in granting summary judgment, the court repeatedly cited

12

Atlantic's new evidence, specifically Dulworth's declaration, which was the only witness testimony as to the loading and securing of the Combine.  This was error.

Nor was Digit required to state more expressly how it intended to respond to Atlantic's reply brief.  An opposing party is entitled to a response, whatever it may be, if the court relies on new materials or arguments in a reply brief.  *See id.* ("[I]f the court relies on new materials or arguments in a reply brief, it may not forbid the nonmovant from responding to these new materials.").  And it appears that Digit, if permitted a response, could produce evidence that creates factual disputes as to which party was responsible for the loading and securing of the Combine.  So we cannot say with any certainty that the failure to give Digit an opportunity to respond was harmless.

Accordingly, while district courts ordinarily retain "broad discretion" to manage their dockets and decide how best to manage the cases before them, *Smith v. Psychiatric Sols., Inc.*, 750 F.3d 1253, 1262 (11th Cir. 2014), the court here abused that discretion by considering new evidence raised by Atlantic in a reply brief and denying Digit an opportunity to respond.  We therefore vacate the grant of summary judgment and remand to give Digit that opportunity.

## B.

Digit next contends that the district court erred in disregarding certain statements in Garside's declaration: (1) that Digit was retained to perform carriage

13

of the Combine as a "no-touch," "shipper-loaded" shipment, and that Digit's driver was not to be responsible for supervision of the loading, blocking, or bracing of the shipment; and (2) that the chains used by Digit's driver were sufficient under federal regulations.

Under Rule 56(c), "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). District courts may disregard statements that are not based on personal knowledge or are inadequately supported. *Pace v. Capobianco*, 283 F.3d 1275, 1278–80 (11th Cir. 2002).

Here, the district court did not err in excluding the challenged testimony. Garside was not present for the loading of the Combine, so he lacks personal knowledge, and his declaration does not offer grounds for his assertions regarding the amount of chains used. Nor does the declaration give any explanation of Garside's grounds for asserting that carriage of the Combine was to be a "no-touch," "shipper-loaded" shipment. While Digit points to the Rate Confirmation as support for this statement, the Rate Confirmation's bare instruction to "[c]ontact Matt Cassidy for loading" cannot reasonably be construed as indicating that Hutson was entirely responsible for both loading *and* securing the Combine. Accordingly, the court properly excluded Garside's statements.

14

In any case, much of this same testimony is included in the declaration of Digit's driver, Hunziker, who has personal knowledge of the loading of the Combine.  So assuming Digit offers Hunziker's declaration on remand, it appears that Digit will not by harmed by the exclusion of Garside's statements, though the court is free to reconsider the admissibility of Garside's statements on remand.

## C.

Finally, Digit contends that its liability was limited to $100,000 by the Rate Confirmation prepared by LDI.  As explained above, when a carrier is liable, it is responsible "for the actual loss or injury to the property caused" unless the carrier's liability has been limited pursuant to the Carmack Amendment.  *UPS Supply*, 750 F.3d at 1286.

In this Circuit, the Carmack Amendment requires a carrier to meet a four-part test to limit its liability:

> A carrier must (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission, (2) give the shipper a reasonable opportunity to choose between two or more levels of liability, (3) obtain the shipper's agreement as to the choice of liability, and (4) issue a receipt or bill of lading prior to moving the shipment.

*Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1306 (11th Cir. 2018) (quoting *Werner Enters., Inc. v. Westwind Maritime Int'l, Inc.*, 554 F.3d 1319, 1326 (11th Cir. 2009)).  Atlantic contends that Digit fails on the second prong.

To satisfy the second prong, "all that is required . . . is that the intermediary and the downstream carrier entered into a written contract providing the shipper with a reasonable opportunity to choose between two or more levels of liability." *Id.* (quotation marks omitted). In this regard, "the intermediary, or the 'shipper's agent,' has the authority to act on the shipper's behalf." *Id.* Therefore, "[w]hen an intermediary contracts with a carrier to transport goods, the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed." *Id.* at 1304 (quoting *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 33 (2004)). That rule holds true even if "the shipper has no knowledge" of the liability limitation. *Id.* at 1305.

Digit maintains that LDI, the intermediary and Hutson's agent, selected the level of liability ($100,000) through the Rate Confirmation by which Digit was hired to transport the Combine, and that no higher value was declared on the bill of lading. Atlantic responds that an "insurance value" is not the same thing as a "declared value" and that Digit failed to offer evidence that either LDI or Hutson had a reasonable opportunity to choose two or more levels of liability.

When we evaluate the second prong—whether the shipper has a reasonable opportunity to choose between two or more levels of liability—which party drafted the liability limitation is important. Although "courts have expounded at length on the various requirements imposed upon a carrier who drafts the contract seeking to

16

limit its own liability, those requirements were intended to protect shippers from carriers who would take advantage of their own superior knowledge and leverage when dealing with unwary shippers." *Siren, Inc. v. Estes Express Lines*, 249 F.3d 1268, 1271 (11th Cir. 2001).    But courts need not "protect shippers from themselves."    *Id.*    Therefore, a shipper will generally be bound by a liability limitation contained in an agreement that it drafted because it has the opportunity to establish different terms.    *Id.* at 1272 (holding that "where the shipper drafted the bill of lading and incorporated industry specific terminology which . . . undisputedly includes a limitation of liability," the shipper cannot avoid the liability limitation even if the shipper did not know what the industry term meant); *see, e.g.*, *Hughes Aircraft Co. v. N. Am. Van Lines, Inc.*, 970 F.2d 609, 612 (9th Cir. 1992) ("Here, Hughes had such reasonable notice and an opportunity to make a deliberate, thoughtful choice in selecting North American's liability limit because it drafted the contract and directly negotiated its terms.").

Here, viewing the record in the light most favorable to Digit, summary judgment should not have been granted to Atlantic on the issue of whether Digit and LDI agreed to a liability limitation of $100,000.  Atlantic's contention that Hutson or LDI had no reasonable opportunity to choose between two or more levels of

17

liability is belied by the evidence.[1]   According to Garside's declaration, LDI knew that Digit "did not carry any load with a value in excess of $100,000 without prior notice and an additional cargo policy in place."   Yet with that knowledge, LDI prepared the Rate Confirmation setting forth the terms of the shipment, including the shipping rate and an "insurance value" of $100,000.  A reasonable inference from these facts is that, by informing Digit that the insurance value did not exceed $100,000, LDI made a choice to ship the Combine at a lower cost.  And Hutson did not state a different "declared value" on the bill of lading in the space provided.  In these circumstances, as in *Siren*, we do not think it unfair to hold Atlantic to a liability limitation drafted by its subrogor's agent.[2]   *See Siren*, 249 F.3d at 1271; *Essex Ins.*, 885 F.3d at 1304.

Atlantic responds that the Rate Confirmation's listing of an insurance value of $100,000 cannot reasonably be construed as a declaration of value.  In adopting similar reasoning in its order denying Digit's motion for reconsideration, the district court relied on our decision in *Fireman's Fund Insurance Co. v. Tropical Shipping and Construction Co., Ltd.*, 254 F.3d 987, 1000 (11th Cir. 2001).  However, while

---

[1] Atlantic does not dispute on appeal that the Rate Confirmation constitutes a written agreement between Digit and intermediary LDI for the transportation of the Combine.  So if the Rate Confirmation contains a liability limitation, Atlantic, as the subrogee of Hutson, is bound by it even if Hutson had no knowledge of the limitation.  *See Essex Ins.*, 885 F.3d at 1304–06.

[2] "[I]n asserting subrogation rights in the name of its insured, the insurance company stands squarely in the place of its insured, having no greater and no less rights against the tortfeasor." *U.S. Fidelity & Guar. Co. v. Carl Subler Trucking, Inc.*, 800 F.2d 1540, 1541 (11th Cir. 1986).

*Fireman's Fund* distinguished between "insurable value" and "declared value" in that case under the Carriage of Goods by Sea Act ("COGSA"), *see id.*, we do not find that distinction persuasive here.

COGSA imposes a $500-per-package limitation on a carrier's liability unless the shipper opts out by declaring a higher value on the bill of lading. *Id.* at 996. In *Fireman's Fund*, the shipper obtained insurance coverage from an insurer for its shipment and apparently listed that amount ($2,547,505) on the bill of lading. *Id.* at 999–1000. When the shipment was damaged, the shipper sought to recover from the carrier as well, contending that the insurable value listed on the bill of lading constituted a "declared value" by which the shipper opted out of the COGSA $500 limitation on liability. *Id.* We rejected that argument, explaining that "the insurable value is relevant with respect to the amount of premium paid to the insurer for coverage of a particular shipment," while "the declared value is relevant in calculating the higher tariff rate paid to the carrier in order for the shipper to opt out of the COGSA $500 limitation on liability." *Id.* at 1000. And it was undisputed that the shipper did not pay additional freight charges that would have been required based on a declared value equivalent to the insurable value. *Id.* Rather, the shipper made a "business decision" to rely on its insurance coverage instead of declaring a higher value on the bill of lading. *Id.* at 1001–02.

19

In this case, however, the "insurance value" of $100,000 listed on the Rate Confirmation does not relate to the amount of insurance coverage Hutson had on the Combine. We know that because Atlantic, Hutson's insurer, paid Hutson over twice that amount based on what it found to be the full value of the Combine before the accident ($239,000). So unlike in *Fireman's Fund*, it does not appear that the "insurance value" listed on the Rate Confirmation "is relevant to the amount of premium paid to the insurer for coverage" of the Combine. *Id.* at 1000. And if the insurance value does not relate to insurance coverage, it must be there to communicate relevant information about the shipment to the carrier, like the other terms of shipment included on the Rate Confirmation. That's consistent with Garside's testimony that LDI knew that Digit "did not carry any load with a value in excess of $100,000 without prior notice and an additional cargo policy in place," and that no additional cargo policy was obtained.

In context, therefore, it appears that the listed value of $100,000 may have been intended to "to limit the carrier's liability in order to obtain a reduced shipping rate." *UPS Supply*, 750 F.3d at 1286. In short, we conclude that a material issue of fact exists concerning whether LDI intended to limit the carrier's liability in order to obtain a reduced shipping rate, when it listed a $100,000 "insurance value" on the Rate Confirmation.

20

## IV.

For the reasons stated above, we vacate the grant of summary judgment in favor of Atlantic and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**